**Benjamin Herbert BOYLE aka Mr. Whipple, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69743.

Court of Criminal Appeals of Texas, En Banc.

Oct. 4, 1989.

Rehearing Granted June 27, 1990.

On Rehearing May 15, 1991.

Certiorari Denied March 9, 1992. See 112 S.Ct. 1297.

William R. McKinney, Jr. (court appointed) Amarillo, for appellant.

Danny E. Hill, Dist. Atty., and Wesley G. Clayton, Jon R. Waggoner, James A. Farren, Michael D. Meredith, Bruce Sadler, Randall Sims and Keith McKay, Asst. Dist. Attys., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DUNCAN, Judge.

The appellant, Benjamin Herbert Boyle a/k/a Mr. Whipple, appeals his conviction of capital murder obtained pursuant to V.T.C.A., Penal Code, § 19.03(a)(2). The death penalty was imposed by the trial court after the jury answered affirmatively the special issues submitted under Article 37.071(b), V.A.C.C.P. Appellant brings twenty-nine points of error before this Court. We reverse the judgment of conviction.

Appellant initially complains that a substantial portion of evidence which was introduced against him in the course of his capital murder trial should have been excluded by the trial court as it was obtained by exploitation of his illegal arrest.[1]

On October 15, 1985, the naked body of Gail Lenore Smith, the deceased, was discovered by a passing truck driver, Donald Ray McKay, concealed in a brushy area approximately one half mile north of the Canadian River Bridge on Highway 287, fourteen miles north of Amarillo in Potter County, Texas. The deceased had been taken by her step-brother and sister-in-law, John and Milagros Wertz, on October 14, 1985 at approximately 4:00 p.m. to a rest stop outside Fort Worth, Texas. The apparent plan was that Smith would obtain a ride from a trucker going to Amarillo so that she could visit her mother.

Both John Wertz and Milagros testified that after the deceased left their vehicle, they watched as she approached an individual, later identified as appellant, and eventually entered his cherry red Peterbilt tractor-trailer. The deceased had requested that the Wertzes record the license tag number, but they were unable to accomplish this. However, they were able to later give a complete description of the truck, which included the name of the company owning the vehicle inscribed on the cab doors: "JEWETT SCOTT Truck Line, Inc., Mangum, Oklahoma."

This information later proved to be invaluable, because once the Wertzes were informed of Gail Smith's death they were able to apprise the investigating officers of their observations. The homicide investigators were then able to trace the tractor-trailer to the appellant, and after contacting the Jewett Scott Truck Lines in Oklahoma, determined the ultimate destination of appellant as Diboll, Texas, where he was to pick up a load at Temple Industries.

At this juncture, the Amarillo investigating officers knew that a naked body had been found, bound with common duct tape, and hidden in a brushy area fourteen miles outside the city. From the details supplied by the family of the deceased, they were also aware that Smith was last seen boarding the cherry red Peterbilt tractor-truck driven by appellant outside Fort Worth, Texas on Highway 287. By the time this information coalesced it was October 17, 1985.

The record of the motion to suppress hearing makes it clear that as of October 17, 1985, the police lacked sufficient probable cause to conduct an investigatory search or to procure the issuance of an arrest warrant for the appellant. Nevertheless, utilizing as authority Articles 20.11 and 24.15, V.A.C.C.P.,[2] Sgt. Walter Yerger of the Amarillo Police Department acquired the issuance of a grand jury material wit-

---

1. In compliance with footnote nine in *McCambridge v. State*, 712 S.W.2d 499, 501 (Tex.Cr.App. 1986), appellant raises four points of error based upon distinct and separate constitutional and statutory theories which are urged in support of the three motions to suppress filed and heard in the trial court. Since the four points to be addressed are so interrelated, they will be discussed together.

2. See fn. 5, *infra*.

ness attachment on October 17, 1985, signed by a district judge, for the appellant.

With the knowledge that appellant would be arriving in Diboll, Texas, a teletype was dispatched to the Diboll Police Department with instructions to arrest the appellant and secure the truck until the arrival in Diboll of the Amarillo entourage consisting of Sgt. Yerger, Corporal Joe Allen and Modeina Holmes all of the Amarillo Police Department; James Farren of the Potter County District Attorney's Office, and Texas Ranger Ronnie Griffin.

In the early evening hours of October 17, appellant was arrested pursuant to the grand jury attachment while he was attending to his truck at a Diboll convenience store. In accordance with the Amarillo instructions, the appellant was arrested, incarcerated and held for the Amarillo officers. The truck was secured and held at the location where the arrest occurred.

The Amarillo team left Amarillo at approximately 9:00 p.m. on October 17, 1985, and arrived in Diboll at 7:00 a.m. on October 18, 1985. Immediately upon arrival in Diboll, Sgt. Yerger conducted an interview with the appellant which lasted between thirty to forty minutes. Prior to the commencement of this custodial interrogation, appellant had executed a form which indicated that he had been administered the full panoply of *Miranda* warnings. After this interview, Sgt. Yerger accompanied appellant to an arraignment before a local justice of the peace on the material witness attachment at 8:33 a.m. Appellant was immediately returned to the Diboll jail where he was again Mirandized by Sgt. Yerger. During the interim, appellant executed a consent to search form for the truck at the behest of Yerger.

By 8:45 a.m., Detective Holmes and Corporal Allen commenced what was to be a thorough and complete investigatory search of the cab and sleeper area of the Peterbilt tractor, and concluded their search at 6:00 p.m. the evening of the 18th. The record reflects that Sgt. Yerger received a 7:45 p.m. teletype that an arrest warrant had been issued at 5:24 p.m. for appellant for the offense of capital murder in Amarillo.[3]

---

**3.** Apparently when the arrest warrant was issued in Amarillo on the 18th of October, nothing recovered from the truck was used as a basis for obtaining the warrant. The affidavit, executed by Sgt. Yerger, read as follows:

That on October 15, 1985, Donald Ray McKay [sic] a truck driver [sic] reported to Potter County Sheriff's Office that he had spotted a naked body at approximately 5:00 p.m. located approximately ½ mile north of the Canadian River Bridge on Highway 287 and approximately 14 miles north of Amarillo, Potter County, Texas. Officers responding to the location located the body, later identified as Gail Lenore Smith by a family member. Affiant in tracing the whereabouts of Gail Smith, on the day before, learned that Gail Smith left Fort Worth, Texas, on October 14, 1985, at approximately 4:00 to 4:30 p.m. Affiant learned that before Gail Smith left Fort Worth she was taken outside the city limits by Gail Smith's sister, Margie Smith, so that Gail Smith could hitch a ride. Margie Smith saw Gail Smith approach a truck driver approximately 7 miles outside of Fort Worth on Route 287. However, before Gail Smith entered the truck she advised her sister, Margie Smith, to record the tag number of the truck. Margie Smith did not at that time write [sic] the tag number of the truck but did get a good look at it and described it to Curt Brenner of the Fort Worth Police Department,

[sic] as having the company name of Jewett Scott Trucking Company. She further described it as a Peterbilt brand semi-tractor truck, cherry red in color with a sleeper cab. Margie Smith gave the foregoing description of the truck to the Fort Worth Police Department after being informed that her sister's body had been discovered by law enforcement officers in Amarillo. Based on the description that Margie Smith gave of the truck, Affiant learned that this company was located in Magnum, Oklahoma. An officer of that company by the name of Steve Scott indicated to the law enforcement officers that the only truck Jewett Scott Trucking Company had in the Fort Worth area on the 14th of October was one driven by Benjamin Herbert Boyle. Steve Scott advised the Affiant that the *truck in question was assigned to* Benjamin Herbert Boyle and that Benjamin Herbert Boyle was an employee of Jewett Scott Trucking Company. Steve Scott also described the truck as having a red or burgandy cloth interior or in the sleeping cab of the semi-tractor truck, and is the only truck that Jewett Scott Trucking Company owns with that type of sleeper interior. Affiant has learned from Modeina Holmes, an I.D. Technician for the Special Crimes Unit of the Amarillo Police Department that investigates homicides that the naked body of Gail Smith was covered

Appellant was transported to Amarillo and ultimately gave a statement denying his guilt on the 19th of October as well as his consent to the police obtaining hair and blood samples.[4]

In appellant's first ground of error he argues essentially that his arrest pursuant to the material witness attachment was illegal in that the law enforcement officers lacked probable cause to either arrest him or search his truck, and that any consent to the warrantless search of the truck was obtained through an exploitation of his illegal arrest in violation of the Fourth and Fourteenth Amendments to the Federal Constitution and Art. I, Sec. 9 of the Texas Constitution. He asserts that his arrest on the material witness attachment was merely a "pretext arrest" to gain his permission to search the truck which they could not have done by following the proper channels consistent with the constitutional mandates.

Responding to the appellant's first point of error, the State tersely asserts that the appellant's arrest in Diboll was not a "pretext" because it obtained a subpoena and attachment for the appellant pursuant to Article 20.10, V.A.C.C.P and Article 20.11, V.A.C.C.P. In this regard, the State submits: "In the case at bar the State complied with the requirements of the Code of Criminal Procedure." The record, however, compels a contrary conclusion.

During the motion to suppress hearing the appellant introduced into evidence a sworn affidavit of an assistant Potter County district attorney. The affidavit claims that the appellant "is a material witness for the State in a Grand Jury investigation...." It continues by claiming that "it is necessary to require bail of the said ... [appellant] to assure his appearance in court, as provided in Vernon's Ann. C.C.P. *Art. 24.15* [emphasis added]."[5] The

with red type fibers. Affiant also learned from Steve Scott that Benjamin Herbert Boyle was to go to Canon City, Colorado, after leaving Fort Worth and go through Amarillo, Texas. Affiant knows from personal experience and from studying a Texas roadmap that a common and convenient route to Canon City from Amarillo would be to go through Dumas, Texas, located on Route 287. The body was discovered between Amarillo and Dumas on the route that Benjamin Herbert Boyle would more than likely have taken. Affiant has also learned that Margie Smith described Benjamin Herbert Boyle as being a white male who was tall, thin, with brown to reddish brown hair, medium to short length, wearing a western dress type shirt. Affiant has also learned from Steve Scott that Benjamin Herbert Boyle, in fact, matches this same description. Affiant has learned from Dr. Ralph Erdmann, a forensic pathologist, that the death of Gail Smith occurred sometime between 1:00 and 5:00 a.m. on October 15, 1985, approximately 8 to 12 hours after Gail Lenore Smith was last seen alive in Forth [sic] Worth, Texas.

We obeserve the the arrest warrant affidavit contains obvious inconsistencies from the testimony at both the motion to suppress and the trial on the merits, which for the purposes of this discussion are irrelevant.

4. The written statement taken on October 19, 1985 at 10:05 p.m., excluding the formal portions, reads as follows:

My name is Benjamin Herbert Boyle. I am 42 years old. My date of birth is 7/22/43. I was born in Hobart, Oklahoma. I live at 401 South Main, Canute, Oklahoma. My home phone number is 405/472/3842. I work for Jewett–Scott Trucking Company. On Monday, October 14, 1985, I was sitting in my truck on US–287 near the Hammon Road Exit when a girl came up to my truck and ask me if I was going to Amarillo. I told her yeah, I was going to towards [sic] Amarillo. I told her I would give her a ride. Sgt. Yerger showed me a photograph and told me the photograph was of Gayle [sic] Smith. The girl in the photograph is the same girl I picked up. While riding in my truck, the girl set her purse in the boot of the sleeper and it fell out. I later found a lighter, a pack of cigarettes, and a make-up brush in my truck. I put all these items in a catch-all thing on the dashboard. I let Gayle [sic] out at the Jolly Truck Stop south of Wichita Falls, Texas, about 7:00 or so on Monday night. I never saw her again. I never had sex with the girl.

5. Articles 20.11 and 24.15, V.A.C.C.P., respectively state:

Art. 20.11. *Out-of-County Witnesses*

Sec. 1. The foreman or the attorney representing the State may, upon written application to the district court stating the name and residence of the witness and that his testimony is believed to be material, cause a subpoena or an attachment to be issued to any county in the State for such witness, returnable to the grand jury then in session, or to the next grand jury for the county from whence the same issued, as such foreman or attorney may desire. The subpoena may require the witness to appear and produce records and documents.

affidavit concludes with a prayer for the issuance of an attachment. An attachment was issued based upon the sworn statements in the affidavit. Bond was set in the attachment at $50,000.

Reading Article 24.15, supra, which is expressly relied upon by the State to authorize the attachment, the defects in the process are readily apparent. First, Article 24.15, supra, is restricted to "any witness who resides in the county...." *Id.* It is undisputed that the appellant was not a resident of Potter County.

Second, before an attachment for a resident witness can issue under Article 24.15, supra, the State's attorney must file a sworn application stating "that he has good reason to believe and does believe that such witness is about to move out of the county." *Id.* It is apparent that such a sworn claim must be made before an attachment can issue and equally apparent why one was not made in this case. Thus, in addition to Article 24.15, supra, being inapplicable, it was understandably not complied with either.

Third, Article 24.15, supra, does not authorize the issuing magistrate to set a bond to insure a witnesses appearance. It only authorizes the imposition of a fine if the witness fails or refuses to obey the subpoena.

Article 20.11, V.A.C.C.P., does authorize the issuance of a subpoena or an attachment for an out-of-county witness and provides that "an attachment shall command the sheriff or any constable of the county where the witness resides to serve the wit-

ness, and have him before the grand jury at the time and place specified in the writ." *Id.* The attachment in this case does not specify when the witness was to appear before the grand jury. See also: Article 24.11, V.A.C.C.P.[6]

Other than the exception authorized in Article 24.15, supra, it is elementary that an attachment for a witness is not authorized until the witness fails to obey a properly served subpoena. This is a prerequisite for the attachment of a resident witness. Article 24.12, V.A.C.C.P. It is also a prerequisite for the attachment of an out-of-county witness. Article 24.22, V.A.C.C.P. In an unrelated claim of error, in *Willis v. State,* 626 S.W.2d 500 (Tex.Cr. App.1982), Judge W.C. Davis, writing for a panel of this Court, stated: "Where a subpoenaed witness fails to appear after being called, an attachment for that witness should be sought." *Id.* at 503.

Under Article 24.22, supra, if a non-resident witness refuses to obey a subpoena a fine not to exceed $500 can be levied. In addition, an order to show cause why the fine should not become final may also issue. Further, "[t]he court may cause to be issued at the same time an attachment for said witness...." *Id.* Consistent with the Court's comment in *Willis v. State,* supra, an attachment for an out-of-county witness cannot be issued properly unless the witness has failed to appear as ordered in the subpoena.

In the case at bar, the State rather incredibly argues that when they requested the attachment for the appellant he was

---

An attachment shall command the sheriff or any constable of the county where the witness resides to serve the witness, and have him before the grand jury at the time and place specified in the writ.

Sec. 2. A subpoena or attachment issued pursuant to this article shall be served and returned in the manner prescribed in Chapter 24 of this code.

\* \* \* \* \* \*

Art. 24.15 *To Secure Attendance Before Grand Jury*

At any time before the first day of any term of the district court, the clerk, upon application of the State's attorney, shall issue a subpoena for any witness who resides in the

county. If at the time such application is made, such attorney files a sworn application that he has good reason to believe and does believe that such witness is about to move out of the county, then said clerk shall issue an attachment for such witness to be and appear before said district court on the first day thereof to testify as a witness before the grand jury. Any witness so summoned, or attached, who shall fail or refuse to obey a subpoena or attachment, shall be punished by the court by a fine not exceeding five hundred dollars, to be collected as fines and costs in other criminal cases.

6. It is uncontroverted that there was no grand jury in session at this time.

not really a suspect. It is their position that since he was apparently the last person to see the deceased alive the grand jury would want his testimony. The fallacy in this argument is that no subpoena was ever requested or issued. Consequently, and assuming the appellant was not a suspect, there was nothing for the appellant to disobey. Therefore, no attachment could have issued.

■ As noted at the outset of this discussion, the record makes it patently clear that the State did not "comply with the requirements of the Code of Criminal Procedure," when it had the appellant arrested on an unauthorized attachment.

In addition to the above, we observe that at the pretrial motion to suppress hearing Sgt. Yerger conceded that when the appellant was initially arrested there was no probable cause which would have allowed the Amarillo law enforcement officers to conduct an investigatory search of the truck. Moreover, at trial Sgt. Yerger admitted that he wanted to "visit" with the appellant because he [appellant] was apparently the last individual to see Smith alive, although he could not say appellant was a suspect. To say that appellant was not a suspect when the material witness attachment was issued strains credulity, since the record clearly indicates to the contrary.

Also, on October 17, the Special Crime Unit of the Amarillo Police Department sent a representative of the Potter County Sheriff's Department to Mangum, Oklahoma and by 8:30 p.m. that evening obtained from Jewett Scott, the owner of the truck line, a written consent to search the truck which the appellant was operating. This was some eleven hours prior to the time that appellant executed a consent to search.[7] As previously noted, the investigating officers were able to determine appellant's ultimate destination, and teletyped the authorities in Diboll to arrest him. It should also be noted that the Amarillo Special Crime Unit did not merely send one or two officers to interrogate the appellant; rather a complete task force or investigative team was dispatched that included an I.D. technician, a Texas Ranger, and a representative of the Potter County District Attorney's Office. Not only were they prepared to transport appellant back to Amarillo, but they were equipped to conduct a complete on-scene investigation. After appellant consented, an on-the-spot search was conducted of the cab and sleeper portions of the truck which took over nine hours to complete and were completed. Additionally, not only was appellant placed under arrest pursuant to the attachment, the district judge set bond at $50,000.00. Clearly, under these circumstances, at the time of appellant's arrest he had become the focus of the criminal investigation concerning the capital murder of Gail Lenore Smith.

■ We do not believe, however, that this was a "pretext arrest" in the traditional sense, *viz:* arresting a suspect for a trivial offense with the intent to extract a confession or conduct a search, the fruits of which could result in a conviction for a more serious offense, for which no probable cause existed for an arrest. See *Black v. State,* 739 S.W.2d 240 (Tex.Cr.App. 1987).[8] We do hold that the procedure utilized in placing the appellant under arrest pursuant to a grand jury material witness attachment was a pretext, subterfuge, and deceptive artifice intentionally employed to circumvent the principles and tenets of the Fourth and Fourteenth Amend-

7. Notwithstanding that the owner of the Jewett Scott Truck Lines, Inc., executed a consent to search, the State does not contest the appellant's standing to assail the search of the Peterbilt tractor in question, nor will we do so *sua sponte.* Nor does the State claim that this alone was sufficient to constitute a legal search.

8. We note that the "pretext arrest" doctrine under current Texas law is still a viable rule which could result in the suppression of evidence, but most recently in *United States v. Causey,* 834 F.2d 1179, 1184 (CA5 1987), the Fifth Circuit rejected it, stating that the subjective intent and motives of the arresting officers are irrelevant so long as they do no more than what they are objectively authorized and legally permitted to do in the circumstances of the initial arrest. *Causey* effectively overruled *Amador v. Gonzalez,* 391 F.2d 308 (CA5 1968) and its progeny. *Black v. State,* supra, does place some reliance on such cases.

130

ments to the United States Constitution and Art. I, Sec. 9 of the Texas Constitution. Consequently, we conclude that appellant's arrest on October 17, 1985, as a result of the issuance of the grand jury attachment, was illegal and unlawful for lack of probable cause. An opposite conclusion, in light of the record, would in essence constitute a suspension of the Fourth Amendment and Art. I, Sec. 10 of the Texas Constitution. As such it would be authority for the State to circumvent the protections accorded by both the United States Constitution and the Texas Constitution and substitute therefor the unrestricted right to arrest and detain anyone solely upon the claim that he is a material witness.

■ As a final observation, we point out that when the district judge issued the grand jury attachment he was not functioning as a neutral and detached judicial officer making a determination as to the existence of probable cause; hence the use of the grand jury material witness attachment under the facts and circumstances of this case was constitutionally infirm. See *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Our conclusion that the issuance of the grand jury material witness attachment was an improper artifice employed to illegally detain the appellant is bolstered by a rather subtle command in the teletype of the attachment. In the teletype, as we have previously noted, the Diboll police were advised of the attachment. In addition, and indicative of the real reason the appellant was arrested, is the following statement: "Preserve vehicle as homicide scene...." One would have to suspend disbelief to conclude anything other than at the time of the teletype the appellant was a suspect in the murder of the deceased. Otherwise, why did the transmission to Diboll request the vehicle be impounded? It is ridiculous to request that the "homicide scene ..." be secured and at the same time, under the facts of this case, claim that the person in control of the "homicide scene ..." is not a suspect.

Having concluded that the arrest of appellant was improper, it is generally necessary that all evidence obtained "as a direct result" of the illegal detention and arrest of appellant under the exclusionary rule of the Fourth Amendment and Art. I, Sec. 9, be suppressed. *Wong Sun v. United States*, 371 U.S. 471 at 485, 83 S.Ct. 407 at 416, 9 L.Ed.2d 441 (1963); *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986). However, the question remains: was the connection between appellant's illegal arrest and his consent to search the Peterbilt tractor, obtained during his illegal detention, sufficiently attentuated from the primary taint to permit the items seized from it to be used at trial to acquire a conviction? *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Following *Wong Sun*, supra, the United States Supreme Court dealt with a series of attenuation cases but none more clarifying than *Brown v. Illinois*, supra. In *Brown*, supra, the defendent was arrested outside his apartment without probable cause and taken to the police station on the suspicion that he was involved in a murder. He subsequently confessed and was thereafter convicted. Prior to extracting the defendant's confession, the arresting officers administered him the now famous *Miranda* warnings. The Supreme Court concluded, however, that the warnings alone were insufficient to attenuate the taint of an arrest procured in violation of the Fourth Amendment. The Court painstakingly pointed out that there was a distinct difference between the *Miranda* warnings, employed as a procedural safeguard to protect Fifth Amendment rights against compulsory self-incrimination inherent in an atmosphere of custodial interrogation, and the exclusionary rule utilized to shield the tenets of the Fourth Amendment. Although custodial statements taken by law enforcement officers without the benefit of *Miranda* are excludable, whether such warnings are given are only a factor in determining voluntariness. The Court unequivocally said that the voluntariness of a statement is but a threshold requirement to a Fourth Amendment analysis. *Brown*, supra, 422 U.S. at 602, 95 S.Ct. at 2261. The rationale for this holding was made clear when the Court stated the following:

If *Miranda* warnings, by themselves, were held to attentuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See *Davis v. Mississippi*, 394 U.S. 721, 726–727, 22 L.Ed.2d 676, 89 S.Ct. 1394 [1397–1398] (1969). Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." See *Mapp v. Ohio*, 367 US [643] at 648, 6 L.Ed.2d 1081, 81 S.Ct. 1684 [at 1687], 84 ALR2d 933 [1961]. [footnotes omitted]

 Such reasoning is equally applicable to a situation which involves an illegal detention followed by the extraction of a "voluntary" consent to search. Attenuation of the initial taint is necessary in order to permit admissibility. In addition, the burden of showing attenuation and thus admissibility rests with the prosecution. See *Brick v. State*, 738 S.W.2d 676 (Tex.Cr. App.1987). In *Brown*, rather than enunciate a proverbial brightline rule for the exclusion of confessions taken after Fourth Amendment violations, the Supreme Court set out four factors, although not exhaustive, which should be considered in determining whether the causal connection between the illegal detention and the statements is broken so that the statements can be considered a product of a free will under *Wong Sun*, supra. See *Bell v. State*, su-

pra. The prominent factors to be considered are:

1) the giving of *Miranda* warnings;
2) the temporal proximity of the arrest and the confession;
3) the presence of intervening circumstances; and
4) the purpose and flagrancy of the official misconduct.

As we recognized in *Brick*, supra, *Brown v. Illinois*, supra, only "held that giving the *Miranda* warnings would not *per se* remove the taint of a confession which, though voluntarily given, followed on the heels of an unconstitutional arrest." *Brick v. State*, supra, at 679. The Supreme Court did not address the situation where a "voluntarily" given consent to search was taken in the environment of an illegal and unconstitutional detention. Adopting an approach suggested in a line of cases from the Fifth Circuit, this Court in *Brick*, supra, at 679–680, held that the full panoply of factors relevant in *Brown*, including an independent analysis of the voluntariness of the consent, was an appropriate method to utilize in deciding the issue as to whether the taint of an illegal incarceration had been sufficiently purged of its initial contamination to validate the consent to search so as to make the discovered evidence admissible.[9] *Brick* then articulated additional factors relevant to consider in reviewing tainted evidence:

> While this Court has not heretofore provided specific guidelines for measuring attenuation of a tainted consent to search, LaFave suggests a number of factors to be considered which are even more detailed than those enumerated in *Brown v. Illinois*, supra, for tainted confessions:
>
> '... In determining whether the consent was, as the Court put it in *Brown*,

---

**9.** See *United States v. Wilson*, 569 F.2d 392, 396–97 (CA5 1978); *United States v. Berry*, 670 F.2d 583, 604–05 (CA5 1982); *United States v. Cherry*, 759 F.2d 1196, 1210–12 (CA5 1985). We also observe that *Brick* was correct in its analysis that the Supreme Court in *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), seems to have approved the standards in *Brick*, supra, but in its opinion the

Supreme Court was actually unclear as to what factors were used in determining whether the consent to search was purged of the taint from the unconstitutional arrest. However, there can be no question that it did disprove of the admission into evidence obtained as a result of a tainted consent to search notwithstanding that it was voluntarily given.

"obtained by exploitation of an illegal arrest," account must be taken of the [1] proximity of the consent to the arrest, [2] whether the seizure brought about police observation of the particular object which they sought consent to search, [3] whether the illegal seizure was "flagrant police misconduct," [4] whether the consent was volunteered rather than requested by the detaining officers, [5] whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, [6] and whether the police purpose underlying the illegality was to obtain the consent.'

LaFave, supra, at 193–94. We now hold that before it can be determined that evidence derived from a warrantless but consensual search following an illegal arrest is admissible, it must first be found, by clear and convincing evidence, not only that the consent was voluntarily rendered, but also that due consideration of the additional factors listed above militates in favor of the conclusion that the taint otherwise inherent in the illegality of the arrest has dissipated. The burden, of course, is on the State.[10]

*Brick v. State*, supra at 680.

We will now consider the militating factors which this Court has tailored precisely for situations involving a consensual search following an unconstitutional detention. Initially, we note that the appellant was indeed given *Miranda* warnings—once prior to and after his initial interview with Yerger. The magistrate's warnings were given at approximately 8:33 a.m.; however, the consent to search had been executed by the appellant almost immediately after the Amarillo investigative team arrived. In any event, *Miranda* warnings would seem of little value in a consensual search situation, since the warnings are intended as a

procedural safeguard to protect one's Fifth Amendment rights against the compulsory self-incrimination inherent to custodial surroundings. More pertinent is whether appellant was made fully aware of the fact that he could decline to consent to the search of his vehicle. In this regard the record indicates that Sgt. Yerger did warn appellant that he could refuse the proposed consensual search. Although such warnings are neither compelled constitutionally under the State or Federal Constitutions, it is a factor which we consider, and in this case weigh in favor of the State.

Next, we examine the temporal proximity of appellant's consensual search to his arrest. The appellant was arrested pursuant to the attachment at approximately 6:00 p.m. on October 17, 1985, placed in the Diboll City Jail and eventually gave his consent to search the following morning at 7:15 a.m. The only thing which occurred during this period was the simple passage of time, thus there was no significant intervening circumstance which would allow this Court to indulge in an inference that the taint of the illegal arrest was purged. For instance, the State has not demonstrated that during this time lapse appellant was able to consult with an attorney or that some judicial officer informed him that he could refuse to consent to the search, thus allowing him to organize his thoughts and contemplate his constitutional rights. In fact, in *Bell v. State*, supra, this Court recognized in footnote four that the passage of time alone demonstrates the paucity of this element as a determinative "factor." Simply put, the proximity factor in this case is not significant to sufficiently break the causal connection between appellant's illegal arrest and the consensual search. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). In fact, the appellant was held for over twelve

10. See also *Dickey v. State*, 716 S.W.2d 499 (Tex. Cr.App.1986); *Daniels v. State*, 718 S.W.2d 702 (Tex.Cr.App.1986). Cf. *Juarez v. State*, 758 S.W.2d 772 (Tex.Cr.App.1988), in which the majority suggests that any militating factors like those articulated in *Brown*, supra, are merely guidelines in determining the question as to whether the taint of an illegal arrest has been

purged so as to allow the introduction of the fruits of a consensual search. This ignores the express language of *Brick*, supra; and to that extent we reject *Juarez*, supra. Specifically, Judge Clinton points out in his dissent in *Juarez*, that factors which are to be considered in deciding whether the consensual search is tainted are not optional.

hours under the guise of a procedure that we have already characterized as a "pretext, subterfuge, and deceptive artifice employed to circumvent the principles and tenets of ...," *infra* at 9, both the United States and Texas Constitutions.

With regard to the next factor, we must consider whether the illegal arrest brought about an exposure of the contents of the Peterbilt tractor and the sleeper container. The Amarillo Special Crimes Unit knew appellant was driving the vehicle in question and had been informed by Jewett Scott Truck Lines that appellant would be in the Diboll area. After obtaining the grand jury material witness attachment, the Amarillo Special Crimes Unit sent a teletype to Diboll authorities to arrest appellant, followed by a telephone conversation with instructions to Diboll to seize the vehicle at the location, then to arrest and secure it until they arrived. After the arrival of the Amarillo contingency, appellant gave his consent to search and numerous items were recovered from the truck's interior. Thus, because of the consent to search the police observed exactly what they sought consent to search. As a result of arresting the appellant, they were able to obtain the consensual search and retrieve the incriminating evidence which they had hoped to detect. Thus, the illegal detention "... brought about [the] police observation of the particular object which they sought consent to search." *Brick v. State,* supra, at 680. Since the search flows directly from appellant's arrest, these circumstances militate strongly against the attenuation of the taint.

We also conclude that one of the prime purposes underlying the initial illegality of the arrest was to obtain the consensual search. The record makes such a conclusion quite obvious. Yerger brought with him a consent to search form which, prior to taking the appellant before a local magistrate, he requested that appellant sign. The Amarillo Special Crimes Unit had arrived in Diboll at 7:00 a.m. and by 7:15 a.m. appellant had affixed his signature to the written consent to search. As a precautionary stratagem an Amarillo Deputy Sheriff was dispatched to Mangum, Okla-

homa, where the president of the truck line executed a consent to search the truck on the very same day. Finally, at the motion to suppress, Yerger conceded that the consent to search forms were taken with him to Diboll because he "... wanted to look in [appellant's] truck." Based on this evidence, we can only conclude that since the Amarillo authorities believed they had no probable cause to arrest or search, the next best alternative was to detain appellant and obtain a consent to search. The means utilized in attaining this end was the grand jury attachment. Such an ill-conceived plan obviously cannot operate in such a manner to break the causal connection between the original taint and the consent to search.

Last, and most importantly, we must determine the flagrancy of the police misconduct. As in *Brown v. Illinois,* supra, the illegality in this case reeks with a quality of purposefulness. The impropriety of the arrest based on the mechanism of a grand jury material witness attachment is obvious; such artifice was used as a substitute for an arrest warrant which Sgt. Yerger acknowledged he could not have procured at the time of appellant's arrest. The blatant purpose of the police action was investigatory in nature, an expedition commenced with the intent of gaining access to the interior of the vehicle, with the key to success of this mission being the appellant's consent to search.

■ Considering all the foregoing factors, we conclude that the State has failed to meet its burden of proof and did not demonstrate by clear and convincing evidence that there were sufficient intervening events between the illegal arrest and the consensual search to break the causal connection so that the consent to search was indeed purged of its primary taint.

This, however, does not end our inquiry. The State further contends that, notwithstanding the taint of the initial arrest, the trial court was correct in denying appellant's motion to suppress on the basis of inevitable discovery and/or the admission

of the items seized from the truck was harmless error. We will consider each contention individually.

Under the "fruit of the poisonous tree" doctrine set out in *Wong Sun v. United States*, supra, the Supreme Court stated that if a search is tainted, the evidence derived therefrom would be inadmissible at trial unless one of the exceptions to the exclusionary rule is applicable so as to permit the introduction of the tainted evidence. One of the exceptions to that rule adopted by the Supreme Court in recent years is the inevitable discovery doctrine invoked by the Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). There the Court stated:

> But when, as here, the evidence in question would inevitably have been discovered *without reference to the police error or misconduct*, there is no nexus sufficient to provide a taint and the evidence is admissible. [emphasis added]

104 S.Ct. at 2511. See also *Dickey v. State*, 716 S.W.2d 499 (Tex.Cr.App.1986).

The Court reasoned that since the basic rationale behind the exclusionary rule is to deter police misconduct by insuring that the prosecution is not put in a better position than it would have been if no illegality had occurred, such policies would not be served if the State can satisfactorily demonstrate that the evidence in question ultimately or inevitably would have been discovered by entirely independent and lawful means. In such an event, the evidence would be admissible. The State, in its brief, claims:

> Even if the trial court had erred in denying Appellant's motion to suppress the evidence, the error would have been harmless. Evidence acquired from an independent source is not tainted by illegal conduct used to obtain other evidence.... The Appellant was only one of several suspects at the time of his

original detention. Even if he had not been detained, police authorities were already in possession of known prints that could be used for comparison and identification. The Appellant's prints were found on the sticky side of the tape which bound the victim. The known prints in Appellant's Colorado criminal file combined with the testimony of Mr. and Mrs. Wertz and the crime scene evidence would have created a very strong case. [citation omitted] [11]

The thrust of the State's argument is that since the Colorado prints could have been compared to the prints on the duct tape and combined with the Wertz' testimony, the State would still have sufficient evidence. This argument is essentially a *non sequitur*. Put simply, the motivation behind the inevitable discovery exception is that the evidence in question would have been discovered by the police via an independent source through legal channels and without a connection to the primary taint. The Supreme Court in *Nix v. Williams*, supra, made it clear that:

> ... *If the prosecution can establish by a preponderance of the evidence* that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense. [Footnotes omitted; emphasis added]

■ It was therefore incumbent that the State establish by a preponderance of the evidence that the discovery of the items seized from the vehicle would have inevitably been discovered through lawful means by the law enforcement officers. The record at the motion to suppress hearing, as well as the record at trial, is totally devoid of a scintilla of evidence which would establish this exception to the exclu-

---

11. At the punishment phase of the trial, Detective William Faulkenberry of the Colorado Springs Police Department testified and apparently in his possession he had what was ostensibly tendered as State's Exhibit No. 500, which apparently was a criminal record file of the appellant which consisted of three white cards with the inked fingerprint impressions of appellant stemming from a previous conviction of appellant in El Paso County, Colorado. Although this exhibit was tendered it does not appear that State's Exhibit No. 500 was in fact introduced. The State did not attempt to present such evidence at the motion to suppress.

sionary rule.[12] The State's mention of Detective Faulkenberry and the fingerprint cards from El Paso County, Colorado, was nothing more than an appellate afterthought. We therefore reject this contention.

It is also necessary that the error be examined under the dictates of Rule 81(b)(2) of the Texas Rules of Appellate Procedure, which states:

*Criminal Cases.* If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

Having perceived error in these proceedings, we now apply the aforementioned standard and seek a determination as to whether this Court can say beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. We will simply commence this discussion by listing various evidentiary items illegally seized from the cab and sleeper portions of the tractor and how they connected this appellant to the capital murder of Gail Smith:

1) State's Exhibit No. 13 is a fiber taken from the cab portion of the tractor and was, according to expert testimony, identical to a fiber found on the duct tape that bound the deceased.

2) State's Exhibit No. 15A is a fiber taken from the cab portion of the tractor and matching a fiber found on the deceased's back.

3) State's Exhibit No. 13 was also found to match State's Exhibit No. 16A, which is a fiber found in the crotch and rectal area of the deceased; further: State's Exhibit No. 17A, a fiber found on the back of the deceased; State's Exhibit No. 18A, a fiber found on the back of the deceased; State's Exhibit No. 21A, a fiber taken off the duct tape which bound the feet of the deceased; State's Exhibit No. 22A, a fiber retrieved from the duct tape that bound the deceased; State's Exhibit No. 22, debris found on the duct tape which bound the deceased.

4) State's Exhibit No. 5A is a dark brown caucasian head hair recovered from the sleeper portion of the tractor and microscopically determined to have been forcibly removed and matched the head hair of the deceased.

5) State's Exhibit No. 93A is a hair found on a paper towel and napkin under the driver's seat of the vehicle and subsequently determined to be a forcibly removed dark brown pubic hair microscopically matching the pubic hairs of the deceased.

6) State's Exhibit No. 73A is a hair found on the floor mat of the cab portion of the tractor and found to match the head hair of the deceased.

7) State's Exhibit No. 75A, are sun glasses found in the cab portion of the tractor which also had on them a dark brown head hair which had been forcibly removed and matched the head hair of the deceased.

8) State's Exhibit No. 52A are paper towels found on the floor of the cab portion of the tractor containing head hairs which matched the hair of the deceased.

9) State's Exhibit No. 76A is a hair found in the cab portion of the tractor

---

**12.** We agree with the Fifth Circuit when they stated in *United States v. Cherry,* 759 F.2d 1196 (CA5 1985), that the Supreme Court in *Williams* "Failed to specify necessary criteria for determining 'inevitability,'" at 1204 n. 9. To remedy this situation the Circuit, following *United States v. Brookins,* 614 F.2d 1037 (CA5 1980), reaffirmed the prerequisites for the invocation of the inevitable discovery doctrine. In order for the evidence to be admissible under the inevitable discovery exception in the Fifth Circuit, the prosecution is required to demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation. *Cherry,* at 1204. While we agree that this or similar criteria can be utilized in determining the appropriateness of applying the inevitable discovery exception, for reasons earlier stated, we find the inevitable discovery exception inapplicable to these facts.

and found to match the head hair of the deceased.

10) State's Exhibit No. 34A is a maroon pouch found on the floor of the cab portion of the tractor which contained hair matching the head hair of the deceased.

11) State's Exhibit No. 69A is a gray T-shirt found in the sleeper portion of the tractor wherein a hair was retrieved which was determined to match the head hair of the deceased.

12) State's Exhibit No. 13A is a hair found on a yellow afghan in the sleeper and determined to match the head hair of the deceased.

13) State's Exhibit No. 62A is a hair recovered from a quilt which was in the sleeper, which matches both the pubic and head hair of the deceased.

14) State's Exhibit No. 79A are vacuum sweepings from the mattress in the sleeper, and contained head hair matching that of the deceased.

15) State's Exhibit No. 88A is a hair found on the Marlboro cigarette carton which was on the dashboard of the tractor, and matched the head hairs of the deceased.

16) State's Exhibits Nos. 20, 54, 86, 10, 69, 83, and 7, were all scrapings of blood, which were consistent with that of the deceased. These scrapings were recovered from various items found in the cab portion of the tractor.

17) State's Exhibit No. 65 is a napkin identified as coming from the tractor and containing blood on it, the typing consistent with that of the deceased.

18) State's Exhibit No. 29 is the appellant's shaving kit determined to contain traces of human blood consistent with the deceased.

19) State's Exhibit No. 13, was a yellow afghan taken from the sleeper portion of the tractor which contained the presence of blood consistent with the blood of the deceased.

20) State's Exhibit No. 91 is material identified as coming from the mattress in the sleeper containing blood spots which were determined to be consistent with that of the deceased.

21) State's Exhibit No. 82 is a jacket found in the cab portion of the tractor and containing blood stains determined to be consistent with the blood type of the deceased.

22) State's Exhibit No. 19 is a swabbing extracted from the sleeper storage compartment which was determined to be human blood matching the blood type of the deceased.

23) State's Exhibit No. 92 are eight tie down cords, all recovered from the cab portion of the tractor, containing human blood stains, all consistent with the blood type of the deceased.

24) State's Exhibit No. 94 is a pill box from which blood scrapings were recovered and determined to be consistent with the blood type of the deceased.

25) Also recovered from the cab portion of the tractor and introduced into evidence were personal items which were identified as belonging to the deceased.

26) State's Exhibit No. 10 is a tire billy found in the cab which the State argued was used to assault the deceased.[13]

As can be seen, the evidence seized from the tractor and introduced into evidence intrinsically associated the appellant to the death of Gail Smith. It corroborated the testimony of Mr. and Mrs. Wertz. Furthermore, the hair and blood stains placed Smith in the truck and could only have left the jury with the inference that some harm had befallen her while she was indeed inside that vehicle. Moreover, from the pubic hair retrieved from the truck one could logically infer that some type of sexual interaction took place between the appellant and the deceased, be it consensual or not. In addition, the fact that personal items belonging to the deceased were found in the truck could result in an adverse inference as to the appellant's guilt.

---

**13.** Not all items seized from the truck and which were introduced into evidence have been enumerated above. All such exhibits whether set out in this opinion or not are likewise suppressed.

Under such circumstances it would be ludicrous to conclude that the admission of such evidence did not contribute to the conviction or punishment. This Court is always hesitant to reverse a conviction for capital murder; but the nature of the crime, no matter how senseless or heinous, is not the criteria. Law enforcement officers are not free to choose under what circumstances they will remain true to the mandates of the Federal and State Constitutions. The State has utterly failed to establish beyond a reasonable doubt that this error of constitutional magnitude was harmless.

In points of error five through ten it is the appellant's contention that the evidence is insufficient to support the allegations in the indictment as incorporated into the charge. See *Benson v. State*, 661 S.W.2d 708, 715 (Tex.Cr.App.1982); *Boozer v. State*, 717 S.W.2d 608 (Tex.Cr.App.1984).[14]

At the conclusion of the guilt-innocence phase of the trial, the court, in the application paragraph of the charge, instructed the jury as follows:

Before you would be warranted in convicting the defendant BENJAMIN HERBERT BOYLE, Also Known as "Mr. Whipple," of capital murder in this case, you must find from beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the felony offense of aggravated sexual assault or the kidnapping of Gail Lenore Smith, as defined in this charge, but also that during the commission of the aggravated sexual assault or kidnapping, if any, the defendant caused the death of Gail Lenore Smith by strangling her with a piece of cloth with the intention of thereby killing her. Unless you find from the evidence beyond a reasonable doubt that the defendant, on said occasion, specifically intended to kill the said Gail Lenore Smith when he strangled her, if he did strangle her, you cannot convict him of the offense of murder.

### VII.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of October, 1985 in Potter County, Texas, the defendant, BENJAMIN HERBERT BOYLE Also Known as "Mr. WHIPPLE," did then and there knowingly and intentionally cause the death of an individual, Gail Lenore Smith, hereafter styled the complainant, by strangling the complainant with a piece of cloth, and the said BENJAMIN HERBERT BOYLE was then and there in the course of committing and attempting to commit the offense of aggravated sexual assault or kidnapping of the complainant, then you will find the defendant guilty of capital murder.

The jury returned a verdict of guilty on both theories submitted, although only a single verdict of guilty was entered.[15] In making this determination, all of the evidence, both proper and improper, will be considered. *Dunn v. State*, 721 S.W.2d 325, 327 (Tex.Cr.App.1986). See also: *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

V.T.C.A., Penal Code § 20.03, provides in pertinent part:

**14.** Excluding the formal portions the indictment read:

... BENJAMIN HERBERT BOYLE also known as Mr. Whipple ..., did then and there knowingly and intentionally cause the death of an individual, Gail Lenore Smith, hereafter styled the complainant, by strangling the complainant with a piece of cloth, and the said Benjamin Herbert Boyle was then and there in the course of committing and attempting to commit the offense of Aggravated Sexual Assault of the complainant,

AND THE GRAND JURORS AFORESAID, upon their oaths aforesaid, do further present in and to said Court that on or about the 15th day of October, A.D., 1985, in said County and State, and anterior to the presentment of this indictment, that BENJAMIN HERBERT BOYLE did then and there knowingly and intentionally cause the death of an individual, Gail Lenore Smith, hereafter styled the complainant, by strangling the complainant with a piece of cloth, and the said Benjamin Herbert Boyle was then and there in the course of committing and attempting to commit the offense of kidnapping of the complainant[.]

**15.** The appellant has not claimed a defect in the manner in which the case was submitted to the jury.

(a) A person commits an offense if he intentionally or knowingly abducts another person.

"Abduct" is defined in V.T.C.A., Penal Code § 20.01(2), as the restraint of a person with the intent to prevent his liberation by, "(A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." Section 20.01(1) defines "restrain" as restricting "a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him." If this "restraint" is accomplished through "force, intimidation, or deception" it is without the victim's consent. Keeping these definitions in mind, and viewing the evidence in the light most favorable to the prosecution, we will now determine whether any rational trier of fact could have found that the State proved beyond a reasonable doubt all the essential elements of the crime. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

We initially note that simply because Gail Smith voluntarily accompanied the appellant in his truck, does not preclude the possibility that at sometime during the course of the journey with the appellant a murder in the course of a kidnapping subsequently occurred. The victim's body was secreted in an area 14 miles from Amarillo, bound and gagged. Not only did the testimony of Mr. and Mrs. Wertz connect the victim to appellant's vehicle, but her pubic hair and blood were found in both the cab and sleeper portions of the tractor. We also observe that within the definition of "abduct" a restraint can be complete without secreting or holding the victim—all that the State must prove is that a person was restrained with the intent to prevent his liberation and that restraint was accomplished by the use or threat to use deadly force. The record is replete with such evidence. Certainly there was a basis in the record to sustain a finding by a rational

trier of fact that at some point the victim was abducted. The appellant, without the consent of Gail Smith, restrained her by interfering substantially with her liberty by at least confining her. It would be reasonable to draw this inference at the point when the victim was bound since the appellant was subsequently connected to this binding through his fingerprints.

Circumstantially, not only did the State link the appellant to the crime, but was able to inferentially establish that sometime after the victim entered the appellant's tractor, the appellant abducted her, and in the course of that abduction she was strangled. We therefore conclude that a rational jury could have found that the State proved beyond a reasonable doubt that the appellant committed capital murder pursuant to § 19.03(a)(2).

Since we have found that the evidence was sufficient to support a conviction of murder in the course of a kidnapping, we will not review the sufficiency of the evidence regarding murder in the course of aggravated sexual assault. *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Cr.App. 1987).

Additionally, in points of error eleven, twelve, and thirteen appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to special issue number two submitted at the punishment stage of the proceedings.[16] In *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App. 1989), this Court set out a basic litany appropriate to determine whether there was sufficient evidence to sustain a jury's affirmative finding that an accused would remain a continuing threat to society:

When deciding whether there was sufficient evidence to support a jury's finding that a defendant will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art.

---

**16.** Pursuant to Article 37.071(b), the second special issue submitted to the jury after a conviction for capital murder reads:

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

37.071(b)(2), supra, beyond a reasonable doubt. See *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986), and *Fierro v. State*, 706 S.W.2d 310, 313, (Tex.Cr. App.1986). At the penalty stage of trial, the jury may consider all of the evidence adduced at the guilt stage. *Santana*, supra at 8, and cases cited therein; and *Fierro*, supra at 319, and cases cited therein.

The jury is permitted to consider many factors whether the defendant will pose a continuing threat of violence to society. Those factors include, but are not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of a prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and
8. character evidence.

*Id.*, at 61.

█ With those observations in mind, we note that the circumstances of this case alone could support the jury's affirmative answer to special issue number two. Cf. *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978). Appellant acted alone and the evidence reveals the calculated nature in which this crime was committed. The victim was not only beaten about the head and face with some sort of blunt instrument, but the deliberateness with which she was bound demonstrated the forethought and contemplation that ap-

parently went into the commission of this offense.

However, this is not a case such as *Duffy* where at the punishment stage of the proceedings no independent evidence was introduced by the State relevant to future violent conduct. Specifically, the State introduced evidence of appellant's prior conviction for kidnapping which in itself is a crime of a violent nature. This at least substantiates the fact that appellant's conduct in this case was not an aberration. The State presented evidence that appellant suffered a poor reputation for being a peaceable law abiding citizen (members of his immediate family reached this conclusion). Considering all of the evidence that the jury had before it relevant to special issue two, we conclude that there existed a basis on which a rational jury could affirmatively answer beyond a reasonable doubt that the appellant constitutes a continuing threat of violence to society. Accordingly, these points of error are overruled.

█ We will last consider appellant's points of error nineteen, twenty, and twenty-one, where it is essentially his contention that the evidence was insufficient to prove venue and jurisdiction in the 320th District Court of Potter County, Texas. We disagree. First, the fact a particular district court in this State does not have venue is irrelevant as to whether that court has jurisdiction. As was stated by this Court in *Ex parte Watson*, 601 S.W.2d 350 (Tex. Cr.App.1980):

> Regarding the criminal jurisdiction of district courts, i.e. the power of those courts to hear criminal cases, Art. 5, § 8 of the Texas Constitution provides only those courts "shall have original jurisdiction in criminal cases of the grade of felony," and of all misdemeanors involving official misconduct. The Texas Constitution provides no other limitation on the jurisdiction of the district courts in regard to criminal matters....

*Id.*, at 351.

Capital murder being a crime of the felony grade, the 320th District Court of Potter County, Texas, had jurisdiction. Venue, on the other hand, concerns the geographic

location within the State where the case may be tried. Cf. *Etchieson v. State*, 574 S.W.2d 753 (Tex.Cr.App.1978). In this regard Article 13.07, V.A.C.C.P. states:

> If a person receives an injury in one county and dies in another by reason of such injury, the offender may be prosecuted in the county where the injury was received or where the death occurred, or in the county where the dead body is found.

█ The State need only prove by a preponderance of evidence that the body of Gail Smith was found in Potter County. The State did this. Appellant, in his brief, argues as if venue was a constituent element of the offense which could negate his guilt if the prosecution failed to prove it. Clearly, this proposition is incorrect. While it must be established, venue is not a "criminative fact" and thus not an essential element of the offense. *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex.Cr.App.1981); *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968). Appellant's points of error are therefore overruled.

Accordingly, the judgment of conviction is reversed and this case is remanded to the trial court.

McCORMICK, P.J., and WHITE and BERCHELMANN, JJ., dissent.

TEAGUE, J., only dissents to the majority opinion's disposition of appellant's points of error numbered 11, 12 and 13.

### OPINION ON STATE'S MOTION FOR REHEARING

MILLER, Judge.

This Court granted one ground of rehearing in this cause to consider the State's contention that "the Court erred in holding that the search of the Peterbilt tractor-truck was illegal because the search was legally conducted pursuant to a valid consent to search of a third party." The State asserts the Court "recognized and raised the issue of third party consent" in footnote 7 of its opinion on original submission, but made no disposition of the issue. In this motion for rehearing, the State contests for the first time appellant's standing to assail the search of the truck and asserts that the third party consent obtained from the owner of the trucking company was valid, thereby making the search a legal one. The State further asserts that its failure to contest the appellant's standing in the trial court does not preclude it from raising this issue for the first time on direct appeal. Appellant contends the State's position is not properly before this Court.

In footnote 7, on original submission, the majority opinion stated, at p. 129:

> Notwithstanding that the owner of the Jewett Scott Truck Lines, Inc., executed a consent to search, the State does not contest the appellant's standing to assail the search of the Peterbilt tractor in question, nor will we do so *sua sponte*. Nor does the State claim that this alone was sufficient to constitute a legal search.

By this footnote, we merely "recognized" that the State had *not* "raised" the issue of third party consent in its reply brief and that is why it was not addressed in the opinion on original submission. Acting upon this footnote, in its motion for rehearing, the State has now raised and argued the third party consent issue as a legal basis for the search which this Court held on original submission was fatally tainted by the appellant's illegal arrest. Thus, we first determine whether the third party consent issue is properly before us for review.

█ In *Wilson v. State*, 692 S.W.2d 661 (Tex.Cr.App.1984) (Opinion on State's Motion for Rehearing), the Court held that the State could challenge for the first time on appeal a defendant's standing to complain of an illegal search or seizure. In *Wilson*, the State raised the standing issue for the first time in the court of appeals, and, after addressing the standing issue and the merits of the search issue, the court of appeals affirmed the appellant's conviction. On petition to this Court, we determined that there was no general rule prohibiting the State from raising the issue of standing for the first time on appeal. The implicit hold-

ing of *Wilson* is that the "first time on appeal" means "direct appeal", and not on "petition for discretionary review." Cf. *Angel v. State*, 740 S.W.2d 727 (Tex.Cr. App.1987).

 The present cause, of course, has not been considered by the court of appeals because the conviction here was for capital murder and the death penalty was assessed as punishment, making direct appeal to this Court automatic. Art. 37.071(h), V.A.C.C.P. As we noted, the State did not raise third party consent on *original submission on direct appeal*, but rather raised the issue on *motion for rehearing on direct appeal*. Thus, the question remains whether the State may raise the issue of third party consent for the first time in this motion for rehearing.

Rule 74 of the Texas Rules of Appellate Procedure governs the preparation and filing of briefs in direct appeals to this Court. See Tex.R.App.Pro. 210(b). In *Rochelle v. State*, 791 S.W.2d 121 (Tex.Cr.App.1990), we discussed the interplay of the various appellate procedural rules and, pertinent to this ground for rehearing, determined the clear import of Rule 74(p) was "that all points of error sought to be reviewed and *all replies* thereto are to be included in the original brief." *Id.* at 124. (emphasis added). We then noted further that supplemental briefs "bringing new matters to the appellate court may be filed later, but only 'as justice requires' or 'in the interest of justice' and under reasonable terms imposed by the [appellate] court." *Id.* Whether to discuss new matters raised in a supplemental brief is left to the sound discretion of the court. *Id.* While recognizing these principles specifically applied to briefs on original submission, we found them equally applicable to a motion for rehearing. *Rochelle*, 791 S.W.2d at 124, citing *Tallant v. State*, 742 S.W.2d 292 (Tex.Cr.App.1987). Thus, whether to consider a new ground raised for the first time on a motion for rehearing is a decision left to the sound discretion of the court.

Clearly, *Rochelle* concerned the orderly and timely presentation of issues on direct appeal to the court of appeals. We find,

however, that the principles announced in that decision are no less applicable to the presentation of issues on direct appeal to this Court. Thus, it is left to our sound discretion to determine whether we will consider a new ground raised for the first time on motion for rehearing. In making this decision, we look to the same circumstances which compel an appellate court to accept a supplemental brief raising a new ground for consideration, *viz:* "as justice requires" or "in the interest of justice" and under reasonable terms imposed by the court. *Rochelle*, 791 S.W.2d at 124, 125. It is with those circumstances in mind that we grant the State's motion for rehearing. A review of the facts pertinent to this ground for rehearing is therefore appropriate.

Appellant filed three motions to suppress the evidence seized during the search following his arrest on the material witness attachment and while he was incarcerated in Potter County. A pretrial hearing was held on the motions, and the State, in its brief on motion for rehearing, has directed us to testimony in the record of the pretrial hearing and the trial which supports the validity of the third party consent. At the pretrial hearing, Deputy Dennis Horn testified he visited with Jewett Scott, the owner of the trucking company, on October 17, 1985, and obtained his voluntary consent to search the truck appellant was driving. Scott told Horn he was the owner of all the trucks that the company operated. The consent form was admitted into evidence at the hearing and also later at trial. Jewett Scott testified at trial that the truck appellant was driving was the property of "our corporation." Jewett's son, Stephen Scott, also testified at trial that appellant was assigned to "our tractor No. 52" when he (appellant) was an employee of the company in September/October 1985. On the basis of this testimony, the State contends Jewett Scott, as owner of the tractor-truck in question, had sufficient authority and control over the vehicle to give a valid consent to search.

We find further testimony in the record of the trial which is illuminative of the

employment relationship between the trucking company and appellant. According to Jewett Scott, each driver who works for him is given a manual of regulations to follow and a company credit card with which to purchase fuel while on the road. Daily records of the credit card charges for fuel are made at the corporate office. Moreover, Stephen Scott testified appellant was paid a percentage of the gross revenue generated by him while driving the truck for the company. Stephen also stated that drivers were occasionally allowed to park their rigs at home, but only with company consent.

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1973), the Supreme Court reiterated the principle from *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), that the search of property, without warrant or probable cause, is valid under the Fourth Amendment with proper consent voluntarily given. The question in *Matlock*, 415 U.S. at 166, 94 S.Ct. at 990, was whether the voluntary consent of a third party was legally sufficient. The Supreme Court concluded that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it may show that consent was "obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993.

The Court explained the concept of "common authority" in a footnote. Common authority is "not to be implied from the mere property interest a third party has in the property." *Matlock*, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, n. 7. See e.g. *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to search of house he had rented to another); and *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room). A legal property interest is not sufficient or necessary because common authority derives from the "mutual use of the property by persons generally having joint access or control for most purposes ..." *Id.* Such mutual use leads to the conclusion that the third party has "the right to permit inspection [of the property] in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* See also *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (defendant assumed the risk that cousin would allow someone to search bag which he shared with cousin and allowed cousin to use).

Relying on these principles discussed in *Matlock*, the Fourth Circuit addressed the third party consent issue in a fact situation similar to the case at bar. In *United States v. Carter*, 569 F.2d 801 (4th Cir. 1977), cert. denied, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978), the defendant was an employee of an oil company, and his duties involved servicing oil burners. In connection with his duties, he was assigned a van which belonged to the oil company. Carter, the defendant, had no authority to use the van for any purpose not connected with oil company business, but he was allowed to take the van home in the evening. Carter was a suspect in a bank robbery in which an oil company van was involved. The FBI obtained the consent of Escann, the owner of the oil company, to search the van driven by Carter. On appeal, Carter challenged the legality of the search of the van and subsequent seizure of a weapon.

The Fourth Circuit upheld the search on the basis of the consent given by the owner of the van,[1] although the court "recognize[d] the fact that Escann owned the truck [2] may not be alone sufficient ground to justify his consent to the search ..." *Carter*, 569 F.2d at 804. Escann's ownership of the van was significant, however, because it formed the basis of the relationship between him and the defendant, and *because of that relationship*, "Carter could not expect to use the vehicle free

---

1. The title to the van was in Calvert Oil Company, of which Escann was the sole owner.

2. The court used the terms "van" and "truck" interchangeably.

from inspection by either his employer or by the police acting with his employer's consent." *Id.* (emphasis added). The facts of Carter's employment indicated he used the van solely at the owner's sufferance. Thus, Escann "possessed common authority over or sufficient relationship to" the van, and the search was justified. *Id.* at 803, quoting *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993.

This Court likewise adheres to the rule that third persons can give valid consent to search when they exercise control over and have authority to use the premises being searched. *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973). *Lowery* concerned a warrantless search of an apartment pursuant to the consent of a seventeen year old woman who apparently was a resident. The Court said the woman had "the capacity to consent" to the search only if she had the right to use and occupy the apartment. 499 S.W.2d at 166. The only evidence of her right to use the apartment was her presence and the presence of women's clothing and "other items" in the apartment. The Court found this evidence was insufficient to establish the requisite capacity to consent to the search. *Id.* *See also* *Swinney v. State*, 529 S.W.2d 70 (Tex.Cr. App.1975).

This Court expressly applied the rule from *Lowery*, regarding third party consent, to automobiles in *Sharp v. State*, 707 S.W.2d 611, 617 (Tex.Cr.App.1986) (no reason why rule for homes and buildings should not apply to automobiles). See also *Swinney v. State*, 529 S.W.2d 70 (Tex.Cr. App.1975) (wife's consent to search her car which defendant was driving and their house was valid). *Sharp* too is factually similar to the present cause. In *Sharp*, a capital murder case, the appellant challenged the legality of the warrantless search of his company truck which was conducted pursuant to his supervisor's consent. The appellant's supervisor testified that he had "unconditional authority to assign or reassign trucks to all the tool pushers under his supervision, one of whom was

appellant." 707 S.W.2d at 617. The Court found this degree of control exhibited by the supervisor was sufficient to establish a valid third party consent. *Id.*

■ On the basis of *Matlock*, 415 U.S. 164, 94 S.Ct. 988, *Carter*, 569 F.2d 801,[3] and *Sharp*, 707 S.W.2d 611, we are persuaded to conclude that the third party consent to search the Peterbilt truck given by Jewett Scott was valid and justified the search. The record clearly indicates that appellant was an employee of Scott, who was the owner of the truck in question. Appellant was assigned a specific truck to drive for the corporation, used a company credit card to pay for his fuel while on the road, and received his paychecks from the company. These facts indicate the supervisory authority and control that Jewett Scott, as owner of the trucking line, had over appellant and the truck he drove. The fact that appellant was allowed occasionally to park his rig at his residence in the evenings is not dispositive because appellant could only do so with company permission. As a result of this employment relationship, appellant could not "expect to use the [truck] free from inspection by either his employer or by the police acting with his employer's consent." *United States v. Carter*, 569 F.2d at 804.

Based on the facts concerning the consent given that were narrated in the opinion on original submission, we conclude the State has adequately shown that the consent to search was obtained from a third party who possessed common authority over and a sufficient relationship to the vehicle sought to be inspected. Therefore, the search of the Peterbilt tractor-truck was legal. Accordingly, the State's motion for rehearing is granted, and appellant's first four points of error, addressed on original submission, are overruled. Therefore, we now will consider appellant's remaining points of error which were not addressed on original submission.

---

3. We recognize this Court is not bound by decisions of any lower federal court. *Stewart v. State*, 686 S.W.2d 118, 121 (Tex.Cr.App.1984), *cert. denied*, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985), and cases cited therein.

In his fourteenth and fifteenth points of error, argued together, appellant asserts the trial court erred in allowing a witness to testify as an expert to the legality of the material witness attachment issued for his arrest. We have reviewed these two points of error and find no merit. Thus, these two points of error are overruled.

In his sixteenth point of error, appellant contends the trial court reversibly erred when it allowed his wife to testify for the State at both stages of his trial in violation of the husband-wife privilege. Besides filing a motion to suppress based on the husband-wife privilege, appellant strenuously objected numerous times to his wife's testimony at both stages of the trial. At a pretrial hearing on appellant's motion to suppress, appellant contended the privilege as stated in Art. 38.11, V.A.C.C.P. (repealed), applied to this cause because the acts and conversations which were the basis of his wife's testimony occurred prior to September 1, 1986, the effective date of the Texas Rules of Criminal Evidence, specifically Rule 504 which replaced Art. 38.11.[4] In response, the State asserted Rule 504 removed the disqualification of the spouse as a witness. The prosecutor recognized that communications of a confidential nature could not be brought out, but replied the State did not intend to elicit that type testimony. The prosecutor stated he "[did] intend to call the wife as a witness and have her testify as to any and all things she observed, any action and conduct and things of that sort, that are of a nontestimonial nature or noncommunicative nature." The trial judge overruled the motion to suppress and all subsequent objections to the wife's testimony.

 The threshold issue confronting this Court is which privilege rule applies to this cause. The wife's testimony concerned events occurring prior to September 1, 1986, the evidence rules became effective September 1, 1986, and appellant's trial began in October of 1986. It is generally recognized by this Court that procedural statutes control litigation from their effective dates and apply to both pending and future actions. See *Zimmerman v. State,* 750 S.W.2d 194, 202 (Tex.Cr.App.1988), and cases cited therein. In *Zimmerman,* 750 S.W.2d at 201, the question was the admissibility of a letter pursuant to Art. 38.22, V.A.C.C.P., written by the defendant to his wife while he was in custody. The 1967 version of Art. 38.22, in effect at the time the defendant wrote the letter, precluded its admissibility, while the 1977 version, in effect at the time of trial, allowed for its admissibility. Under the general principle regarding applicability of procedural statutes, as stated above, the 1977 version would have controlled at trial. In *Zimmerman,* however, there was an exception to this general rule because the amendatory act providing for the 1977 version expressly stated that that act "applie[d] only to statements made on or after the effective date" of the act. *Id.* at 202. Thus, the 1967 version of Art. 38.22 was applicable at the defendant's trial.

In the present cause, there is no express provision in the rules of evidence regarding the applicability of the rules to statements made before their promulgation. In the absence of an express intent to the contrary, a procedural statute controls litigation from its effective date. *Wilson v. State,* 473 S.W.2d 532, 535 (Tex.Cr.App. 1971). At the risk of overstating the obvious, a rule of evidence addressing admissibility sets forth a rule of procedure. See e.g. *Wilson,* 473 S.W.2d at 535 (Art. 38.22 addressing admissibility of oral confessions is rule of procedure). Thus, we conclude Rule 504, in effect at the time of appellant's trial, controls. Cf. *Willard v. State,* 719 S.W.2d 595 (Tex.Cr.App.1986) (conviction reversed for violation of Art. 38.11 in effect at time of trial; in event of retrial, after effective date of rules of evidence, Rule 504 applies).

 We may now address the merits of appellant's point of error. Appellant, however, has limited his argument to the law

---

**4.** Appellant also argued on the motion to suppress that application of Rule 504 to the cause, instead of Art. 38.11, amounted to an ex post facto application of the rule. Appellant does not raise this same contention in his brief on appeal, and we therefore do not address it.

and authorities pursuant to Art. 38.11, which we have held inapplicable. Yet, a comparison of Art. 38.11 and Rule 504 is instructive in addressing this point of error. Former Art. 38.11 provided that, during the existence of the marital relationship, a spouse was incompetent to testify adversely to an accused spouse. Goode, Wellborn, and Sharlot, 33 Texas Practice, Guide to the Texas Rules of Evidence: Civil and Criminal, § 504.6 (1988). Article 38.11 provided in relevant part that:

> Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution.

Evidence Rule 504 abandoned this marital disqualification. Rule 504(2)(a) states in pertinent part:

> **(2) Privilege not to be called as a witness against spouse.**
>
> (a) *General rule of privilege.* The spouse of the accused has a privilege not to be called as a witness for the state. This rule does not prohibit the spouse from testifying voluntarily for the state, even over objection by the accused ...

With the promulgation of Rule 504, the absolute disqualification of former Art. 38.11 was removed and replaced with a privilege to not be called as a witness for the State. *Johnson v. State*, 803 S.W.2d 272 (Tex.Cr.App.1990). This privilege may be asserted only by the defendant's spouse, and the defendant has no power to prevent his or her spouse from testifying for the State. *Id.* at 281. Thus, a spouse may testify even over the defendant spouse's objection.

In the trial of the present cause, the State called Elneta Boyle, appellant's wife, to testify in its behalf at both stages of this trial. Although appellant strenuously objected, Mrs. Boyle did not assert her "privilege not to be called as a witness for the state." There is nothing in the record which even suggests Mrs. Boyle did not voluntarily take the stand for the State. We therefore hold, under Rule 504(2)(a), the trial court did not err in permitting Mrs. Boyle to testify. Appellant's sixteenth point of error is overruled.

In the seventeenth point of error, appellant asserts the trial court erred in permitting the deceased's mother to testify as to the victim's identity. Appellant argues the mother was called solely for the purpose of having the witness "breakdown" before the jury. In the eighteenth point of error, appellant contends the trial court erred in admitting into evidence a crude cartoon. We have reviewed both these points and find that neither has merit. Thus, points of error seventeen and eighteen are overruled without further discussion.

For the sake of brevity, appellant argues three points of error together, each of which addresses the exclusion of evidence offered by the appellant during guilt/innocence. In point of error twenty-two, appellant contends the trial court erred in excluding the victim's diary; and in points of error twenty-three and twenty-four, appellant complains of the exclusion of testimony from two witnesses, Roy McCarty and Gary Casida respectively, regarding prior sexual acts with the deceased. Appellant claims the evidence is admissible under Rule 402, Tex.R.Crim.Evid., because it is relevant to the issue of consent and because its probative value outweighs "the danger of unfair prejudice due to its admissibility pursuant to Texas Rules of Evidence, Rule 412(b)(3), as it was necessary to rebut and explain the scientific or medical evidence offered by the State."

In the indictment, the State charged appellant with two counts of capital murder, to-wit: murder in the course of aggravated sexual assault, and murder in the course of kidnapping, of which the former is perti-

nent to this discussion.[5] During trial, the doctor who performed the autopsy on the deceased testified he could not give an opinion as to whether the deceased had been sexually assaulted because he did not take any smears from her mouth. Additionally, an FBI serologist testified he conducted tests to identify blood and semen from the deceased's vagina and thigh, and neither was identified. The serologist also conducted tests on swabs taken from the victim's mouth, and he identified semen on them. However, the serologist could not testify the semen came from appellant, nor was he qualified to testify whether the semen was there as a result of consensual sex or a sexual assault.

The appellant called the victim's sister, Margaret Rose Smith, to testify at trial. Out of the jury's presence and through a bill of exception, defense counsel questioned Smith regarding entries in her sister's diary which discussed several male companions. One specific entry stated she had sex several times during August and September of 1985 with "Perry B.", who was a former boyfriend of the victim. Defense counsel asked Smith about six other men mentioned in the diary, but with no other reference to sexual encounters. Finally, defense counsel asked Smith if her sister, the victim, "ever engaged voluntarily or consentually (sic) in oral sex with any of these individuals or with any other individuals", to which Smith answered she did not know. That testimony concluded the first bill of exception.

The State objected to the admission of this evidence on the ground the defense had shown "absolutely no relevance." The State pointed out the lack of testimony regarding the temporal proximity of any sexual encounters and the victim's death, and the lack of testimony that the victim had in fact engaged in oral sex. The trial judge sustained the State's objection.

Out of the presence and hearing of the jury, the defense also presented the testi-

mony of the two witnesses, McCarty and Casida.[6] McCarty testified he had met the victim at a lake party the previous summer (1985). After knowing the victim only two to four hours, McCarty and the victim had oral sex in a friend's Corvette. According to McCarty, the victim initiated this sexual encounter, which lasted only a few minutes due to the unexpected presence of a park ranger. After cross-examination by the State, but without formal objection, the trial judge denied admissibility of McCarty's testimony. Casida then testified to substantially the same facts. He had also met the victim at the lake where, after knowing her for about "half a day", they spent the night together at a lodge. Casida stated that he had had three sexual encounters with the victim, each including oral sex. According to Casida, these encounters occurred from August of 1985 to approximately two to three weeks before the victim's death. Admission of this testimony was also denied by the trial judge.

In these three points of error, appellant urges the diary and the testimony from the two defense witnesses were admissible to show the semen found in the victim's mouth resulted from a consensual sexual encounter between appellant and the victim and to rebut the medical evidence from the autopsy doctor and the serologist. The applicable statute is Rule 412 of the Texas Rules of Criminal Evidence which provides:

**Rule 412. Evidence of Previous Sexual Conduct**

(a) In a prosecution for sexual assault or aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault, reputation or opinion evidence of the past sexual behavior of an alleged victim of such crime is not admissible.

(b) In a prosecution for sexual assault or aggravated sexual assault, or attempt to commit sexual assault or aggravated sexual assault, evidence of specific in-

---

**5.** The trial judge instructed the jury at guilt/innocence on both theories, and the jury returned a verdict of guilty on both counts, as we noted on original submission. See slip op. at p 29.

**6.** The testimony was elicited, and the bill was thus made, in the trial judge's chambers to prevent its availability to the media, thereby protecting the victim.

stances of an alleged victim's past sexual behavior is also not admissible, unless:

(1) such evidence is admitted in accordance with paragraphs (c) and (d) of this rule;

(2) it is evidence (A) that is necessary to rebut or explain scientific or medical evidence offered by the state; (B) of past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior which is the basis of the offense charged; (C) that relates to the motive or bias of the alleged victim; (D) is admissible under Rule 609 [Impeachment by Evidence of Conviction of Crime]; or (E) that is constitutionally required to be admitted; and

(3) its probative value outweighs the danger of unfair prejudice.

(c) If the defendant proposes to introduce any documentary evidence or to ask any question, either by direct examination or cross-examination of any witness, concerning specific instances of the alleged victim's past sexual behavior, the defendant must inform the court out of the hearing of the jury prior to introducing any such evidence or asking any such question. After this notice, the court shall conduct an in camera hearing, recorded by the court reporter, to determine whether the proposed evidence is admissible under paragraph (b) of this rule. The court shall determine what evidence is admissible and shall accordingly limit the questioning. The defendant shall not go outside these limits nor refer to any evidence ruled inadmissible in camera without prior approval of the court without the presence of the jury.

(d) The court shall seal the record of the in camera hearing required in paragraph (c) of this rule for delivery to the appellate court in the event of an appeal.

(e) This rule does not limit the right of the accused to produce evidence of promiscuous sexual conduct of a child 14 years old or older as a defense to sexual assault, aggravated sexual assault, indecency with a child or an attempt to commit any of the foregoing crimes. If such evidence is admitted, the court shall instruct the jury as to the purpose of the evidence and as to its limited use.

Only sections (b), (c), and (d) are relevant to the evidence proffered by the defense in this cause.[7] In determining the scope of admissibility of evidence of past sexual conduct under this rule, it is helpful to review the predecessor statutes addressing the same.

Section 21.13 of the Penal Code was the first codified "rape shield" provision in this State, and it was later modified slightly and recodified as Section 22.065, of the Penal Code.[8] Acts 1983, 68th Leg., pp. 5311,

---

7. Appellant does not claim the trial judge failed to comply with the provisions of subsections (c) and (d). Thus, for purposes of these points of error, we will assume subsection (b)(1) has been complied with and proceed to address the admissibility of this evidence pursuant to subsection (b)(2).

8. Penal Code § 22.065, Evidence of Previous Sexual Conduct, provided:

(a) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct may be admitted under [the sexual assault and aggravated sexual assault sections] of this code only if, and only to the extent that, the judge finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

(b) If the defendant proposes to ask any question concerning specific instances, opinion evidence, or reputation evidence of the victim's sexual conduct, either by direct examination or cross-examination of any witness, the defendant must inform the court out of the hearing of the jury prior to asking any such question. After this notice, the court shall conduct an in camera hearing, recorded by the court reporter, to determine whether the proposed evidence is admissible under Subsection (a) of this section. The court shall determine what evidence is admissible and shall accordingly limit the questioning. The defendant shall not go outside these limits nor refer to any evidence ruled inadmissible in camera without prior approval of the court without the presence of the jury.

(c) The court shall seal the record of the in camera hearing required in Subsection (b) of this section for delivery to the appellate court in the event of an appeal.

(d) This section does not limit the right of the state or the accused to impeach the credibility by showing prior felony convictions nor the

5315, ch. 977, § 4, eff. Sept. 1, 1983. See also 33 Texas Practice, *Guide to the Texas Rules of Evidence: Civil and Criminal*, § 412.1, p. 210. The statute was largely a procedural device. See *Ex parte Rose*, 704 S.W.2d 751, 760 (Tex.Cr.App.1984) (Clinton, J., concurring) (Section 22.065 essentially a procedural device to shield testifying victim of sexual abuse—a sort of statutory order *in limine*). Section 22.065(b) required the defendant to inform the trial court that he planned to introduce evidence of the complainant's previous sexual conduct, upon which the trial court had to conduct an in camera hearing to decide whether the evidence was admissible, i.e. it was relevant and its probative value exceeded its prejudicial nature. Rule 412(c) is substantially the same as § 22.065(b) and embraces these procedural provisions.

This Court utilized a two-step test in determining the admissibility of previous sexual conduct evidence under §§ 21.13 and 22.065. See *Allen v. State*, 700 S.W.2d 924, 929 (Tex.Cr.App.1985), and *Pinson v. State*, 778 S.W.2d 91, 93–94 (Tex.Cr.App. 1989) (citing *Allen*). First, the trial judge examines the proffered evidence in light of a specific fact at issue in the trial, and then determines if some or all of the proffered evidence is material to that fact. If the trial judge determines the evidence is material, he secondly decides whether its probative value exceeds its prejudicial nature. *Allen*, 700 S.W.2d at 929; *Holloway v. State*, 751 S.W.2d 866, 870 (Tex.Cr.App. 1988). Texas courts have been reluctant to find prior sexual history evidence to be material. See e.g. *Pinson*, 778 S.W.2d 91 (victim's admission of intercourse 48 hours before sexual assault, opinion that defendant ejaculated during assault, and doctor's testimony regarding non-motile sperm properly excluded); *Holloway*, 751 S.W.2d

866 (victim's reputation as common prostitute not material to consent issue); *Boutwell v. State*, 719 S.W.2d 164 (Tex.Cr.App. 1985) (victim's extraneous sexual conduct irrelevant to nonconsensual offenses under § 21.13); *Allen*, 700 S.W.2d 924 (prior sexual conduct inadmissible on consent issue); and *Capps v. State*, 696 S.W.2d 486 (Tex. App.—El Paso 1985, pet. ref'd.) (consent issue alone inadequate to support inquiry into victim's sexual behavior; evidence victim engaged in sex parties and group sex inadmissible in aggravated rape case).

With the promulgation of Rule 412 came more elaborate substantive terms as to the admissibility of a complainant's past sexual behavior. Pursuant to section (b)(2), Rule 412 expressly provides for the admissibility of specific instances of an alleged victim's past sexual behavior but only for certain enumerated purposes. Of course, the probative value of that evidence must outweigh its prejudicial effect to complete the test for admissibility.[9] Thus, disregarding the procedural requisites of section (b)(1), we find that the admissibility of past sexual behavior evidence is still subject to a two-part test, *viz:* (1) the evidence must fall within one of the five enumerated circumstances in Rule 412(b)(2); and (2) its probative value outweighs the danger of unfair prejudice.

A comparison of this two-part test with that employed pursuant to former Penal Code §§ 21.13 and 22.065 indicates that this Court, in promulgating Rule 412, specifically section (b), statutorily defined when evidence of past sexual behavior is "material" to a prosecution for a sexually assaultive offense. Rather than determining materiality on a case-by-case basis, we look to Rule 412(b)(2). With this in mind, we now

---

right of the accused to produce evidence of promiscuous sexual conduct of a child 14 years old or older as a defense to sexual assault, aggravated sexual assault, or indecency with a child. If evidence of a previous felony conviction involving sexual conduct or evidence of promiscuous sexual conduct is admitted, the court shall instruct the jury as to the purpose of the evidence and as to its limited use.

9. Contrast this test in Rule 412 with that contained in Rule 403, which provides:

**Rule 403. Exclusion of Relevant Evidence on Special Grounds**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

turn to the merits of appellant's points of error.

 Appellant raises two arguments in support of admission of the diary and the testimony from McCarty and Casida. First, appellant argues this evidence of the victim's past sexual conduct is admissible to show the alleged act of oral sex between them was consensual. In essence, appellant offers this testimony to prove that the victim acted in conformity with this behavior when she was a passenger in his truck. Rule 412(b)(2)(B) provides that specific instances of the victim's past sexual behavior is admissible if it is evidence of past sexual behavior *with the accused* and is offered by the accused upon the issue of consent. The rationale for this rule has been succinctly stated:

> Comprising [Rule 412(b)(2)(B) ] is evidence of the complainant's past sexual activity with the defendant, if offered to prove consent. While evidence of previous sexual relations with others is ordinarily not probative on the issue of consent, this category recognizes that such behavior between the complainant and the defendant is of greater relevance. The probative value of the evidence flows not from an inference regarding the complainant's character, but rests instead on the nature of the specific relationship between the complainant and the defendant. Whether its probative value will outweigh the danger of unfair prejudice will depend on a variety of factors, such as the similarity in circumstances and the proximity in time of the previous sexual relations to the alleged assault. (footnotes deleted)

33 Texas Practice, § 412.2, pp. 213–214. Clearly, appellant's proffered evidence as to the victim's past sexual conduct did not encompass any acts with him. Thus, this evidence is not material to the consent issue and is not admissible pursuant to Rule 412(b)(2)(B).

Secondly, appellant offers this evidence to show it was not his semen found in the victim's mouth, since the medical evidence was inconclusive on this point, and thus he could not have sexually assaulted her as alleged. Appellant attempts to show that the victim had a different sexual partner prior to his meeting her. Rule 412(b)(2)(A) permits the admissibility of the victim's past sexual behavior if the evidence is necessary to rebut or explain scientific or medical evidence offered by the state. We find, however, that the evidence offered by appellant does neither. The victim's diary indicated she had sex with "Perry B." sometime in August and September of 1985. Likewise, McCarty stated he had oral sex with the victim in August of 1985, one month prior to this offense. Casida had the more recent sexual encounter with the victim and that instance occurred, at the least, two weeks prior to her death. Without medical evidence that semen could exist for such prolonged periods of time, we find these instances are not sufficiently close in time to the commission of this offense to rebut or explain the State's evidence. Moreover, in light of appellant's consent argument, this evidence lacks any probative value. If appellant did in fact have consensual sex with the victim, then whether he was the source of the semen found in the victim's mouth would no longer be important, as there would be no sexual assault and no need to prove the semen came from some other male. 33 Texas Practice, § 412.2, p. 213.

We hold the trial judge properly excluded the evidence of the victim's past sexual behavior. Points of error numbers twenty-two through twenty-four are overruled.

In his final five points of error, numbers twenty-five through twenty-nine, appellant complains of jury arguments made by the State. We have reviewed these points and find that they have no merit. Thus, these five points of error are overruled.

In sum, we grant the State's motion for rehearing, and, finding no merit in appellant's points of error, we affirm the judgment of the trial court.

CLINTON, J., dissents.

BAIRD, Judge, concurring.

I agree with the majority that the State's motion for rehearing should be granted and

appellant's conviction should be affirmed. I further concur with the majority's analysis and disposition of all of the issues presented, with the exception of one issue. I write separately because I believe that the Court misconstrues the law of third party consent. I concur in the disposition of this cause, however, because I believe that there was no harm resulting from the admission of the illegally obtained evidence.

I was not a member of this Court when it issued the opinion on original submission. See page 125. That opinion held that the search of appellant's Peterbilt truck was illegal and reversed the conviction because the Court could not determine beyond a reasonable doubt that the error made no contribution to the conviction. See Tex. R.App.Pro. Rule 81(b)(2). After reviewing the record, I am convinced that the error attendant to the illegal search was harmless.

## I.

The opinion on original submission set forth twenty-six pieces of evidence admitted at trial which were derived from the illegal search, 135–136, and concluded the admission of such evidence contributed to the conviction. *Id.,* at 137. I disagree. I believe that the Court fell into error when it assessed the volume of the tainted evidence, instead of looking to the effect of the tainted evidence adduced at trial, as required by *Harris v. State,* 790 S.W.2d 568, 588 (Tex.Cr.App.1989) (analysis for determining whether error was harmless).

Appellant's guilt was conclusively established through "non-tainted" evidence. Appellant's initial connection to this crime was established through the information provided by John and Milagros Wertz. They saw the deceased board appellant's truck, and they provided information which ultimately allowed the authorities to locate appellant and his truck. Their testimony was in no way "tainted" by the State's misuse of the Grand Jury attachment to seize appellant. Additionally, it is undisputed that appellant's fingerprints were found on pieces of duct tape which bound the deceased's

naked body. Her nude body was found secreted in an area several miles outside Amarillo, bound in a "hog-tied" fashion and gagged. She had been beaten about the head and face with some sort of blunt instrument; she had been strangled. Appellant's fingerprints were located on the adhesive side of the duct tape which was wrapped around deceased's face and head, and also on pieces which bound her hands and connected her hands to her bound feet. This compelling evidence is also unrelated to the State's improprieties. *Id.,* 790 S.W.2d at 588 (overwhelming evidence can be a factor to be considered in a harmless error analysis).

While the "tainted" evidence admitted at trial is voluminous, I believe that its admission would not affect an average rational juror. In short, I believe that appellant's trial was an "essentially fair one," and that the tainted evidence was not of such a magnitude that it "disrupted the juror's orderly evaluation of the evidence." *Ibid.* Therefore, I would conclude beyond a reasonable doubt that the erroneous admission made no contribution to the conviction. *Id.;* Tex.R.App.Pro. Rule 81(b)(2). Accordingly, I would affirm appellant's conviction.

## II.

However, I believe the majority errs in its analysis of third party consent. Under the facts of this case, the owner of the truck, Jewett Scott, could not give effective third party consent. In *U.S. v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court articulated the test for validity of third party consent where the police obtained consent to search a bedroom from a woman who occupied that room as the defendant's cohabitant. The Court upheld the validity of the warrantless search on the theory of third party consent where the third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* 415 U.S. at 172, 94 S.Ct. at 993.

The Supreme Court concentrated on the "common authority" the third party held. "Common authority is, of course, not to be

implied from the mere property interest a third party has in the property." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Property interest is insufficient to establish justification for third party consent as *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (lessor's consent not generally good against lessee), and *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk's consent not normally effective against registered occupant), had so held. Property interest is unnecessary to the determination because such authority could be inferred from "mutual use of the property by persons generally having joint access or control for most purposes ..." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The requisite conclusions about common authority, to be drawn from the facts of mutual usage, were said to be that the third party had "the right to permit the inspection in his own right and that the others [had] assumed the risk that one of their number might permit the common area to be searched." *Id.*

In *Illinois v. Rodriguez*, — U.S. —, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court held that the third party from whom police obtained consent to search the defendant's apartment did not have common authority or control of the apartment. The defendant's girlfriend, visibly battered and bruised, informed the police that the defendant was responsible for her injuries. She told police that she knew where the defendant could be found. She possessed a key to the defendant's apartment and referred to the apartment as "our apartment." When the police entered the apartment with the woman's key, they found narcotics in plain view.

The Supreme Court concluded that there was insufficient common authority or control to effectively give third party consent. The record established that while the woman had once lived in the apartment, she no longer lived there. She only occasionally spent the night at the apartment and had previously moved most of her belongings out of the apartment. It is unclear whether the defendant even knew that the woman still had a key to the apartment. The Court held, however, that while the woman did not have the common authority or control to give the consent, the police might have reasonably believed that she did. *Rodriguez*, — U.S. at —, 110 S.Ct. at 2801. Accordingly, the Supreme Court remanded the cause to the Court of Appeals.[1]

The majority opinion suggests that the reasoning of *Sharp v. State*, 707 S.W.2d 611 (Tex.Cr.App.1986), and *U.S. v. Carter*, 569 F.2d 801 (4th Cir.1977), should control the disposition of the case at bar. However, these cases are factually distinct from the instant cause.

This Court addressed whether a defendant's supervisor could validly give consent to search a vehicle used by an employee in *Sharp*, 707 S.W.2d 611. The defendant, a drilling rig worker, was a suspect in the capital murders of a woman and her daughter. He was arrested pursuant to an arrest warrant, and the truck which he was driving at the time of arrest, his employer's truck, was searched pursuant to consent given by his supervisor. The opinion does not suggest what, if any, evidence was seized from the truck. It states that the supervisor had unconditional authority to assign or reassign trucks to all the tool pushers under his supervision, one of whom was the defendant. The Court summarily concluded, "We find the degree of control exhibited by [the defendant's] supervisor sufficient enough to establish a valid consent, dispensing then with the requirement of a search warrant." *Id.*, 707 S.W.2d at 617.

The Court of Appeals for the Fourth Circuit addressed a similar situation where a defendant's truck, assigned for work related purposes only, was searched pursuant to consent given by the defendant's boss,

---

1. Other cases have upheld the common authority or control where a defendant's spouse has given consent to search a vehicle, *Swinney v. State*, 529 S.W.2d 70 (Tex.Cr.App.1975); *U.S. v. Baldwin*, 644 F.2d 381 (5th Cir.1981), and where

a defendant's parent, who has control of house where defendant lives, gives consent to search defendant's bedroom. *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983).

the owner of the truck. *Carter*, 569 F.2d 801. The Court concluded that the owner could give consent to search, noting that while the defendant was permitted to drive the truck to and from work, its use was not authorized for any purpose unconnected with the business. *Id.* 569 F.2d at 804. "Moreover, [the owner] at his caprice, could reassign the van to another employee." *Ibid.*

The record in the case at bar reflects that the owner of the truck, Jewett Scott, did not possess "common authority over or other sufficient relationship" to the truck. *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993. The record indicates that the truck, used for hauling large quantities of products, was under appellant's *exclusive* control during his interstate travels. At the time of the offense, Scott Truck Line operated approximately forty trucks, nationwide, from its headquarters in Mangum, Oklahoma. Under appellant's contract with Scott Truck Line, appellant was paid according to a percentage basis of the gross revenue that the truck generated. Appellant's assigned routes, consisting of several hundred miles, took days to complete. The truck which appellant drove was equipped with a "sleeper," which a Scott Truck Line employee described as a place of "security" for the driver, and as the "driver's home away from home." Apparently, when appellant was out on the road but between assignments, he was still in *exclusive* control of the truck and could use the sleeper for a place to sleep.[2]

A "mere property interest" is neither sufficient nor necessary to the determination of "common authority," *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Jewett Scott's ownership of the truck is not dispositive of the issue of whether he could give effect third party consent. As we reiterated recently in *Moberg v. State*, 810 S.W.2d 190 (Tex.Cr.App.1991), a guest in a hotel or motel does not lose his expectation of privacy in the rented premises until the rental or occupancy period has terminated.

Appellant, having contracted to drive this large truck, equipped with a sleeper, for hundreds of miles and through several states, including the expanse of Texas, could not be said to have "assumed the risk" that the owner, in Oklahoma, might permit the truck to be searched in Texas. Under these circumstances, Jewett Scott, the owner of the truck line, did not possess common authority over or other sufficient relationship to the truck to give effective third party consent. *Matlock*, 415 U.S. at 172, 94 S.Ct. at 993. Contrary to the majority's assertions, *Sharp*, 707 S.W.2d 611, and *Carter*, 569 F.2d 801, are neither dispositive nor persuasive authority for determining third party consent in this cause.

For the reasons set forth herein, I concur in the judgment of the Court.

OVERSTREET and MALONEY, JJ., join this opinion.

---

**2.** Appellant delivered a load from Duke, Oklahoma to San Antonio, Texas. His route ended in San Antonio on Friday, October 11, 1985.

His new route began on Monday, October 13, when appellant picked up a load in Diboll, Texas for delivery in Canon City, Colorado.