**Louanne LARSON, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 06–94–00042–CR.**

Court of Appeals of Texas, Texarkana.

Dec. 13, 1994.

Discretionary Review Refused March 22, 1995.

Clifton Holmes, Holmes Law Office, Longview, for appellant.

James P. Finstrom, Jefferson, for appellee.

Before BLEIL, GRANT and T.C. CHADICK, JJ.

## OPINION

GRANT, Justice.

Louanne Larson appeals from her conviction for capital murder. Larson contends that the trial court erred by admitting her oral statement and evidence seized under her consent to search because they were tainted by her illegal arrest and that the court erred in overruling her motion to transfer venue.

This case is based upon the same facts as those set out in our opinion disposing of the appeal of Tim Rule.

## ADMISSION OF ITEMS SEIZED PURSUANT TO CONSENT

Larson first contends that the trial court erred by admitting evidence obtained through a search of Larson's apartment, car, and business establishment. She contends that she was arrested under an invalid warrant and that the taint inherent to this illegal arrest extended to her consent to the search.

**The Arrest Warrant.**

█ The first part of this argument is based upon Larson's contention that the affidavit upon which the arrest warrant was obtained was legally inadequate. The affidavit is a preprinted form stating that

"I, ____, do solemnly swear that I have good reason to believe, and do believe and charge that on or about the ____ day of ____ A.D. One Thousand Nine Hundred and ____ and before the making and filing of this complaint, in the County of ____, and State of Texas, ____ did then and there unlawfully...."

The blanks were filled in with the appropriate names and dates, and the empty space beneath the preprinted form describes the crime committed. This exact form was reviewed and found wanting in *Miller v. State*, 736 S.W.2d 643 (Tex.Crim.App.1987) (opinion on rehearing). That affidavit was found insufficient to establish probable cause because it contained the specific language that had previously been condemned in *Green v. State*, 615 S.W.2d 700 (Tex.Crim.App. [Panel Op.] 1981), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). In those cases, as in the present case, the affidavit stated that the affiant "has good reason to believe and does believe and charge," rather than containing factual statements setting out allegations of personal knowledge or other source for the complainant's belief. The affidavits then continued, as does the affidavit in this case, by reciting the statutory elements of the charged offense. As in those cases,

this affidavit also consists of nothing more than the officer's conclusion that the accused perpetrated the murder described in the complaint.

■ Before a warrant for arrest can be issued, the Constitution requires that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. *Green*, 615 S.W.2d at 706, *citing Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). As in *Green*, we are constrained to conclude that the affidavit provided the judge with no basis for an independent determination of probable cause and that the arrest warrant issued pursuant thereto was invalid. *Green*, 615 S.W.2d at 706; *see also Rumsey v. State*, 675 S.W.2d 517 (Tex.Crim. App.1984).

### Is Larson's Consent to Search Valid?

■ The remaining question is whether the illegality of the arrest warrant requires that the evidence seized as a result of the search made after the illegal arrest should be excluded. The Court of Criminal Appeals has concluded that there is no per se rule prohibiting the use of evidence obtained as a result of a consent search following an illegal arrest, stop, or detention. After an extensive discussion in *Juarez v. State*, 758 S.W.2d 772 (Tex.Crim.App.1988), the court listed the factors used to determine whether a confession given following an illegal arrest is sufficiently attenuated to permit the use of a confession at trial. The court concluded that those factors were also appropriate guidelines for determining whether evidence obtained through a consent search following an illegal arrest was proper.

Those factors are (1) whether *Miranda*[1] warnings were given; (2) the temporal proximity of the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Boyle v. State*, 820 S.W.2d 122, 131 (Tex.Crim.App.1989), the Court set out addi-

tional factors relevant to consider in measuring the attenuation of a taint as including whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent, and whether the police purpose underlying the illegality was to obtain the consent.

■ Evidence obtained from a warrantless but consensual search following an illegal arrest is admissible if the State proves by clear and convincing evidence that the consent was voluntarily rendered and that the preceding factors militate in favor of the conclusion that the taint inherent in the illegality of the arrest has dissipated. *Brick v. State*, 738 S.W.2d 676, 681 (Tex.Crim.App. 1987).

■ In the present case, it is undisputed that *Miranda* warnings were given. The second factor is the temporal proximity of the arrest to the consent to search. The records introduced at the suppression hearing indicate that the arrest took place at 11:35 a.m. and that the consent to search was signed at 11:40 a.m. As noted by *Juarez*, this factor is often considered to be an ambiguous factor, noting that in some situations a prolonged detention may be "a more serious exploitation of an illegal arrest than a short one." *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (Stephens, J., concurring); *Bell v. State*, 724 S.W.2d 780 (Tex.Crim.App.1986).

There was very little time for any intervening circumstance to occur that would avail the State in this situation. *See Woods v. State*, 806 S.W.2d 351, 354–55 (Tex.App.— Texarkana 1991, pet. ref'd). Although this factor falls in favor of Larson, it is difficult to give it alone much weight without consideration of all other factors. *Juarez*, 758 S.W.2d at 782.

The fourth factor is the purpose and flagrancy of the official misconduct. There is no indication of any misconduct by the police officers in this situation. The affidavit was prepared by the district attorney's office after the officers came to them and informed them about the information that they had

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.    1602, 16 L.Ed.2d 694 (1966).

acquired. The testimony clearly shows that the officers had the personal knowledge necessary to properly obtain a search warrant— and equally clearly shows that the information was inadequately transferred to the affidavit presented to the issuing judge. Thus, it can be confidently stated that the officers acted in good faith in obtaining the arrest warrant. There is also no indication or allegation of any coercion, duress, or other improper act by the officers at the time that they obtained the consent. In this case, the undisputed evidence is that the police requested the consent and that it was not volunteered. Thus, this factor falls in favor of Larson.

In determining whether Larson was fully aware of her right to refuse consent, one additional fact in this case comes down strongly in favor of finding that the search was not an improper result of the illegal arrest: Larson was a certified peace officer, who was a member of the Pittsburg police department.[2] Thus, her knowledge exceeds that of the general public and guarantees that she would be fully aware of her right to refuse the request to search. This militates in favor of the conclusion that she was well able to exercise her free will and decide whether to consent to the search.

The final factor concerns the reason behind the arrest. *Boyle* and *Juarez* both involve situations where probable cause to arrest did not exist in any fashion before the arrests occurred, and officers testified that their purpose in making the arrest was to create a situation where a consent to search might be obtained. Although the officers testified that they hoped to obtain a consent, the arrest was not staged in order to obtain the consent. Probable cause for the arrest existed, but was not adequately presented to the issuing judge. Thus, this factor falls in favor of the State.

From a totality of the circumstances, it appears that the taint of the illegal arrest was sufficiently attenuated to validate the consent to search and thus makes the discovered evidence admissible. *See Myers v.*

*State,* 680 S.W.2d 825 (Tex.App.—Amarillo 1984, pet. ref'd).

An alternative basis suggested for permitting the evidence to be admitted is the theory of "inevitable discovery."

In a plurality opinion, the Texas Court of Criminal Appeals has recently held that the inevitable discovery doctrine does not apply to the statutory exclusionary rule of TEX. CODE CRIM.PROC.ANN. art. 38.23 (Vernon Supp.1994). *Garcia v. State,* 829 S.W.2d 796, 798 (Tex.Crim.App.1992); *see also Oliver v. State,* 711 S.W.2d 442, 445 (Tex.App.—Fort Worth 1986, no pet.) (judicial exception of "inevitable discovery" does not apply to exclusionary rule of Article 38.23). *Garcia* and *Oliver* both indicated that if such an exception is to be applied to Article 38.23, it must come by way of legislative amendment and by judicial creation. *See Garcia,* 829 S.W.2d at 799–800; *Daugherty v. State,* 876 S.W.2d 522, 524 (Tex.App.—Fort Worth 1994, no pet. h.); *Oliver,* 711 S.W.2d at 445. Thus, the evidence was properly admitted.

## VENUE

◼ Larson next contends that the trial court erred by refusing her motion for a change of venue because of prejudicial pretrial publicity surrounding the case. The Code of Criminal Procedure provides that a change of venue may be granted if "there exists in the county where the prosecution is commenced so great a prejudice against [a defendant] that he cannot obtain a fair and impartial trial." TEX.CODE CRIM.PROC.ANN. art. 31.03 (Vernon 1989). The test to be applied in determining whether the court should grant a motion to change venue is whether "the outside influence affecting the community climate of opinion as to a defendant are so inherently suspect as to raise doubt about the likelihood of obtaining a fair and impartial jury." *Teague v. State,* 864 S.W.2d 505, 509 (Tex.Crim.App.1993); *Henley v. State,* 576 S.W.2d 66 (Tex.Crim.App. 1978).

---

**2.** The record does not clearly reflect when her employment with the police department ended. It does reflect that she was employed by the police department within two or three months of her arrest.

In *Henley,* the court listed several factors relevant in determining whether an outside influence affecting the community climate of opinion as to the defendant is inherently suspect. These factors include: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any other factor likely to affect the candor or veracity of the prospective jurors on voir dire. *Id.*

Jurors do not have to be totally ignorant of the facts and issues for a particular case. *Ransom v. State,* 789 S.W.2d 572, 579 (Tex.Crim.App.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990). In order to prevail, a movant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory. *Teague,* 864 S.W.2d at 510. When a motion for change of venue is denied, this Court reviews whether the trial court abused its discretion in refusing to grant the change of venue. *Id.*

The motion for change of venue was accompanied by the affidavits required by Article 31.03, which were controverted by the State.[3]

Larson argues that the publicity surrounding the murder, their first capital murder trial, and the subsequent hung jury, mistrial, and escape to Mexico, recapture, and return to Marion County for trial all militate in favor of changing venue. She argues that the publicity resulting from these activities necessarily caused the requisite prejudice against her so that she could not obtain a fair and impartial trial. Counsel has not directed the court to any testimony that would support this position. There are no references

to the record under this argument, with the sole exception of citation to that part of the record where the court overruled the motion to transfer venue.

Counsel points out that the trial court struck for cause forty-five jurors out of a panel of ninety-five. Although the trial court did not render its decision until after voir dire was finished and the jury selected, the court had previously held a change of venue hearing as contemplated by Chapter 31. After hearing testimony from several different individuals and hearing argument from counsel, the court was obviously disturbed but not convinced that a fair trial could not be held in Marion County. He adopted a suggestion that a questionnaire be sent out to the potential jurors to obtain additional information. If specifically asked whether the individuals were familiar with the facts of the case, had been exposed to media stories about the case, had formed an opinion about the case, and if so, whether they could render a judgment based solely on the facts adduced at trial, whether the things they might have heard, read, or seen about the case would influence them in reaching a verdict, or any other reason they believed that they could not sit as a juror and render a verdict based solely on the evidence presented.

Most of the panel stated that they were aware, to one degree or another, of the alleged facts and rumors surrounding the case, and many of them had seen media stories leading up to and about the previous trial. Such knowledge is not fatal to the jury selection process, so long as there is evidence that jurors could try the case strictly on the evidence before them. *Eckert v. State,* 623 S.W.2d 359, 363 (Tex.Crim.App. [Panel Op.] 1981). Even extensive knowledge in the community of either the crime or accused is not sufficient by itself to render a trial constitutionally unfair. *Faulder v. State,* 745 S.W.2d 327, 339 (Tex.Crim.App.1987), *citing Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

---

**3.** Controverting affidavits are authorized under Tex.Code Crim.Proc.Ann. art. 31.04 (Vernon 1989):

The credibility of the persons making affidavit for change of venue, or their means of

knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge, and the motion granted or refused, as the law and facts shall warrant.

The jurors selected all indicated on voir dire that they could and would decide the case on the evidence before them. The mere fact of media attention and publicity does not automatically establish prejudice or require a change of venue. *Teague,* 864 S.W.2d at 509, *citing Freeman v. State,* 556 S.W.2d 287, 297 (Tex.Crim.App.1977). As previously stated, it is not necessary for a juror to be completely unaware of publicity surrounding a particular offense. *Ransom,* 789 S.W.2d at 579.

There is evidence that would support the positions of both the State and appellant on this issue. Thus, under an abuse of discretion review, it appears that no error has been shown.

The judgment of the trial court is affirmed.

Concurring opinion by CHADICK, J.

Dissenting opinion by BLEIL, J.

Honorable T.C. CHADICK, J., Texas Supreme Court, Retired Sitting by Assignment.

CORNELIUS, C.J., not participating.

T.C. CHADICK, Justice (Retired), concurring.

The primary emphasis of appellant Larson's brief and argument and the disagreement arising between members of the panel is the application of legal principles to the facts recorded in the case. Appellant Larson contends that the trial court erred in admission into evidence of her oral statement and evidence seized when she consented first to a search of her apartment and thereafter to a search of her automobile and the premises of the club she operated.

For reasons set out in the opinion affirming the case, the panel agrees that Larson's arrest was illegal. The present focus of examination is whether Larson's post-arrest consent to the searches in question was voluntary and the product of her free will or the product of the exploitation of the illegal arrest.

In this discussion, effort will be made to minimize or completely avoid repetition of facts and authority set out in the other opinions filed herein. The objective here is to marshal additional facts that support a valid conclusion that judgment of the trial court should be affirmed.

The voluntary nature of an accused's consent may be resolved by evidence bearing upon (1) whether or not the *Miranda* warning was given; (2) the temporal proximity of the arrest and consent; (3) the presence and nature of any intervening circumstances; and (4) the purpose and flagrancy of alleged official misconduct. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Boyle v. State,* 820 S.W.2d 122, 131–32 (Tex.Crim.App.1989);[4] *Juarez v. State,* 758 S.W.2d 772, 780 (Tex.Crim.App.1988); *Brick v. State,* 738 S.W.2d 676, 680–81 (Tex. Crim.App.1987).

The voluntary nature of Larson's consent to the search is to be determined by the

---

**4.** This case undertakes a comprehensive summary of relevant authority in this excerpt:

> *Brick* then articulated additional factors relevant to consider in reviewing tainted evidence:
>
> While this Court has not heretofore provided specific guidelines for measuring attenuation of a tainted consent to search, LaFave suggests a number of factors to be considered which are even more detailed than those enumerated in *Brown v. Illinois, supra,* for tainted confessions:
>
> '... In determining whether the consent was, as the Court put it in *Brown,* "obtained by exploitation of an illegal arrest," account must be taken of the [1] proximity of the consent to the arrest, [2] whether the seizure brought about police observation of the particular object which they sought consent to search, [3] whether the illegal seizure was "flagrant police misconduct," [4] whether the consent was volunteered rather than requested by the detaining officers, [5] whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, [6] and whether the police purpose underlying the illegality was to obtain the consent.'
>
> LaFave, supra, at 193–94. We now hold that before it can be determined that evidence derived from a warrantless but consensual search following an illegal arrest is admissible, it must first be found, by clear and convincing evidence, not only that the consent was voluntarily rendered, but also that due consideration of the additional factors listed above militates in favor of the conclusion that the taint otherwise inherent in the illegality of the arrest has dissipated. The burden, of course, is on the State.

totality of the evidence, a question of fact. *Johnson v. State,* 803 S.W.2d 272, 287 (Tex. Crim.App.1990). Consent is not to be lightly inferred; voluntary action must be shown by clear and convincing evidence and the absence of either physical or psychological coercion. *Juarez v. State,* 758 S.W.2d at 774–75, and authorities there cited.

Furthermore, to avoid the taint of illegal arrest the prosecution must establish a break in the causal connection between the illegality of the arrest and the evidence discovered as a result of consent, that is, the prosecution must show consent as a product of the accused's free will. The temporal proximity factor, that is, the time interval between the arrest and the accused's consent, standing alone, is often ambiguous. Relevant intervening circumstances and other factors must be examined in connection with it. Proof of temporal proximity alone is looked upon by numerous courts as the most unreliable of the several factors that may be considered in determining the voluntariness issue. *See Juarez,* 758 S.W.2d at 781–82.

In considering intervening circumstances, the courts examine evidence, if any, that is claimed to attenuate the deleterious consequence of the illegal arrest. The dictionary defines "attenuated" as meaning "to weaken or reduce in force, intensity, effect, quantity or value." Thus, the time interval is immaterial when clear and convincing evidence is produced of intervening circumstances of a nature sufficient to nullify or neutralize the harmful effect an illegal arrest imposes upon an accused's exercise of free will. *See Arcila v. State,* 788 S.W.2d 587, 593 (Tex.App.— Dallas 1990), *aff'd,* 834 S.W.2d 357 (Tex.Crim. App.1992).

There is evidence in the record that an illegal arrest was made and in five minutes thereafter an arresting officer prepared and Larson signed a consent form allowing a search of her apartment. Later, she also signed a consent for a search of her automobile and the premises of the club she operated, known as Lou's Place. The asserted five-minute time interval will be analyzed. The arresting officer was accompanied to Larson's apartment by six law officers with guns drawn. That officer and those supporting

him were admitted to the apartment by a person at the door and proceeded to a bedroom where Larson and Tim Rule were in bed asleep. The officer announced to Larson and Rule that they were under arrest. At that point at least ten people, a crowd, were in the apartment.

Both Larson and Tim Rule were nude. Rule was required to dress and was escorted under arrest from the room. The male officers retired from the bedroom and left Larson in the custody of a female deputy sheriff. Larson proceeded to dress. After she was dressed, the arresting officer and another reentered the bedroom and read her the *Miranda* warning. Following further conversation between the officer and Larson, at 11:40 a.m. she signed a written consent form permitting a search of her apartment. The consent to search Larson's automobile and club premises was later signed at 12:53 p.m.

From the facts so far noticed, it may be inferred that when the sleeping couple were awakened, conversation necessary to convey the fact that the couple was under arrest occurred. Also, that allowing Rule time to dress himself before removal to the local jail consumed time. Then time was consumed in withdrawing male officers from the bedroom and placing Larson in the custody of the female deputy sheriff. Consumption of time was incident to allowing Larson to dress preparatory to her incarceration, as well as reading her the *Miranda* warning.

Reasonably and necessarily, more than five minutes' time was consumed between arrest and consent. Common knowledge supports an inference that the prospect of being jailed when dressing was complete would not encourage a person to hastily dress. Also, after the arrest dispersing the several officers to other duties as well as preparing the written consent to search, examination of the paper, some discussion and signing increased the time consumed between arrest and consent.

The sum of the facts refute a serious contention that consent to search the apartment was given within five minutes after arrest. But in fairness, the record reflects that the passage from arrest to consent was expedi-

tious. Consideration must be given to the facts, if any, that attenuate or render immaterial any probable hindrance, diminishment, or restriction the illegal arrest imposed upon the accused's exercise of free will.

Appellant Larson served seven years as a Pittsburg, Texas [5] peace officer, the first two as animal control officer and the remainder as a uniformed patrol officer. She attended and graduated from the Kilgore Police Academy.[6] Ms. Larson received a certificate from that institution which allowed her to be employed as a peace officer. At the time of the offenses charged in this proceeding, she was a deputy constable in a Camp County Justice of the Peace Precinct. Her general, though not immediate, supervisor while employed at Pittsburg was Lieutenant Otis Dwayne McClung. In the record, her co-defendant, Tim Rule, is said to be Larson's boyfriend, and co-defendant Tim Rice is described as Larson's confidant and a habitué at Lou's Place. Shortly prior to death, Charles Edward "Eddie" Wardlaw was employed at Lou's Place as doorman and collected cover charges from patrons. Cedric Baker is named as a friend of Wardlaw and appears to have lost his life by being at the wrong place at the wrong time.

After Larson's arrest and while free on bail, the record shows that she sought out Lieutenant McClung and insisted upon recounting to him her lack of connection with the homicides for which she had been indicted. As a witness, Lieutenant McClung testified,

What she told me was that the police need to be looking at a different location, a different direction in regards to her murder case and in regards to some other people that were involved with it.

Replying to further interrogation, he said,

She stated to me that Tim Rice had had a fight at her club with a guy by the name of Eddie and that [he] had busted Eddie's lip and he was bleeding, and she also stated there was a black male there whose name she didn't know and that Eddie, after the fight, had requested—not Eddie but Tim

Rice had requested to borrow her vehicle, and he left the club with this black male and Eddie after the fight and after they had borrowed her vehicle.

The lieutenant also testified that he understood from Larson's conversation that these parties were alive and well when they left.

On further questioning, Lieutenant McClung testified,

She said, in the first part of the conversation with me, that the police need to look in a different direction because drugs being hooked up with Tim Rice and Kirk Rule and they were hooked up with Mafia in the Houston area.

The State produced evidence that Larson asked Rice to bring Wardlaw to her office at the club in the early morning hours of Saturday, November 14, 1992, so that arrangements might be made for Wardlaw to pay her money she claimed Wardlaw had stolen from the club. Rice had previously left Wardlaw at a residence in the club area. Tim Rice, Tim Rule, Larson, and a female friend of Rice were socializing at the club prior to Rice's departure to pick up Wardlaw. The group "used" a drug called "speed." Rice departed, carrying his female friend home, and picked up Wardlaw and Cedric Baker, who happened to be visiting with Wardlaw, and brought both to the club office. Tim Rule admitted them into the club and seated them in Larson's office, then left and turned the sound volume up on the jukebox.

After the three waited a short time, Larson came out of an office side room and asked Wardlaw if he had her money. She then asked Rice to whip Wardlaw. Rice kicked Wardlaw in the mouth. Larson then shot Wardlaw three times with her 9mm pistol and left the office for a short time. When she returned, she told Rice to shoot Baker, which he did with the same pistol. Thereupon, Larson cleaned the office, and Rule and Rice loaded Wardlaw's and Baker's bodies into trash cans and put them in the trunk of Larson's Lincoln automobile. Rice and Rule drove the vehicle to a remote area

---

5. Camp County.

6. The testifying witness stated that she had graduated at the top of her class, but was not certain.

of Red River County and dumped the bodies out.

A day or so after Rice and Rule returned from dumping the victims' bodies, Larson traded the 9mm pistol involved in the homicides to an aunt for a much less valuable weapon, explaining that the 9mm was heavier than she liked. Also, after the bodies were dumped and Rice and Rule returned to the club area, Rice took Rule's truck to return and bury the bodies, but did not do so. Instead, he arranged through intermediaries to meet with Texas Rangers in Idabel, Oklahoma.

It may be inferred from factual evidence that Larson did not hesitate to make important decisions on the spur of the moment and was not inclined to spend much time deliberating even a life or death decision.

Even more importantly, at the time Larson gave consent to the search of her apartment, she did not know that Rice had confessed the homicidal episode to law enforcement authorities. It may be inferred from the evidence that Larson, at the time she gave consent for search of her apartment, felt that her guilty participation in the homicides was safely beyond discovery. Larson had reason to think that directing Rice to shoot Baker would make him guilty of a murder he could not afford to admit and seal his lips as a witness, also that Rule was her bedfellow whom she could rely upon to disavow knowledge of the crime because of his participation, and was probably under the impression at that time the victims' bodies occupied graves many miles distant from her club. On the facts known to her, the evidence suggests she could well assume that a bold show of indifference to a search of her apartment or possessions would tend to deflect suspicion from her and a thorough search would not follow.

In addition to facts heretofore recited and those discussed in the opinion with which this concurs, inferences may be drawn from the record of Larson's manipulative efforts and homicidal proclivity, together with her status and experience as a law enforcement officer and her years of association with the area law enforcement fraternity, that her consent was a contemptuous estimate of the capacity and skill of the minions of the law to make a search that would yield incriminating evidence against her. The evidence as a whole is clear and convincing in this respect. Her calm and audacious actions indicate confidence that she considered herself too cunning for the truth to be revealed and that any search that would be made would produce nothing for her to dread. Nothing occurred before the second consent to search was given to change this mind-set.

On the factor of purpose and flagrancy of official misconduct, if any, the evidence discloses that the law enforcement officers proceeded in a very professional way with the homicide investigations. The arresting officer sought legal counsel from the district attorney for Titus County, as well as the county attorney of Marion County. At the officer's request, the Marion County attorney applied to the district judge of the county for an arrest warrant. The Marion County attorney prepared the application, order, and warrant, and the judge, after hearing, authorized issuance.

On the advice of the Titus County district attorney that a search warrant should not be sought, but instead that permission to search be requested of the arrested party, the arresting officer did not request counsel to apply for search warrants. The officer was advised that he had a perfectly lawful procedural option to request an arrested person to give consent to search, and the evidence discloses no trickery, deceit, action, or conduct designed to coerce, overreach, mislead, or otherwise improperly induce Larson to consent to a search at any time, before or after the request was made.

The arrest warrant was invalid because of errors of law in the application and hearing. No conduct of the enforcement officers can be characterized as flagrant. Neither can the procedural errors of law that invalidated the warrant be described as flagrant misconduct. If commission of an error of law in a legal proceeding is per se flagrant misconduct, the active State Bar, including the judiciary, frequency so offends.

The original concurring opinion filed herein is withdrawn and this revised concurring

opinion replaces it. Reconsideration of the disposition of the case has been made, some minor factual inaccuracies have been corrected, and additional evidence pointed out and discussed. For the reasons stated, I concur in overruling the motion for new trial and affirmance of the judgment herein.

BLEIL, Justice, dissenting.

Hard cases make bad law. This is such a case.

The State failed to prove by *clear and convincing* evidence that the taint resulting from the illegal arrest had dissipated when, five action-packed minutes later, Larson gave the officers consent to search. Because this legal issue is fact sensitive, the facts surrounding the unlawful arrest and the consent to search are critical.

On November 18, 1992, Tim Rice, through his brother, contacted Howard Dunham, a Texas Ranger, concerning two murders in Marion County. The following day Dunham went to Idabel, Oklahoma, and met with Tim Rice for about eight hours. Rice informed Dunham and other law enforcement personnel that Louanne Larson had shot and killed two men. Rice, who along with Tim Rule had disposed of the bodies, led the law enforcement officers to the bodies of Cedric Baker and Eddie Wardlaw.

After confirming the deaths, Dunham believed that a search of Larson's apartment and Lou's Place, the nightclub where the murders occurred, might be needed. Dunham conferred with Charles Bailey, the Titus County district attorney, about obtaining a search warrant. Bailey advised Dunham that rather than obtaining a search warrant he should arrest Larson and attempt to get her to consent to a search of her residence and business premises.

Thereafter, on the morning of November 20, Dunham went to Tony Hileman, the district attorney of Marion County, for assistance in obtaining arrest warrants for Larson and Tim Rule. Dunham signed the two defective "affidavits for information" that were provided by the Marion County district attorney's office and which formed the basis for the illegal arrest warrants issued by F.L. Garrison, 115th District Court Judge, Marion County, at about 10:45 a.m.[7]

Thereafter, seven law enforcement officers, including Ranger Brantley Foster and Dunham, proceeded to Larson's apartment. Several officers, with guns drawn, knocked on the apartment door. When a man named Jack Sanders answered the door, the officers proceeded to the bedroom. At 11:35 a.m., Foster, Dunham, and another officer entered the bedroom, where Larson and Rule were naked and asleep. When they were awakened, Rule was groggy and both Rule and Larson appeared startled. In a loud voice to gain control and attention, Foster told them that they were under arrest and not to move.

Rule got out of bed and dressed, then the male officers left the bedroom with him. Larson remained behind and got dressed while Liz Templin, a female Marion County deputy sheriff, remained with her.

After Larson got dressed, Foster and Dunham re-entered her bedroom. Dunham read Larson her rights. Larson signed a consent form for the search of her apartment at 11:40 a.m. Later, at 12:33 a.m., Larson signed a consent form for the officers to search Lou's Place and her personal automobile. As Dunham said, "[I]t all happened rather quickly."[8]

With these facts in mind, it is appropriate to undertake to apply the law to the facts. I agree with the majority that we must analyze the attenuation issue pursuant to *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine whether the State proved by clear and convincing evidence that the taint of the illegal arrest was sufficiently attenuated from obtaining Lar-

---

7. The affidavit used did not set forth facts but merely said, "I have reason to believe, and do believe and charge . . ." Affidavits merely asserting conclusions or beliefs were found to be constitutionally infirm as early as 1971. *See Whiteley v. Warden of Wyoming Penitentiary*, 401 U.S. 560, 564, 91 S.Ct. 1031, 1034–35, 28 L.Ed.2d 306, 311 (1971).

8. Following the arrest, officers Foster and Templin transported Larson to the jail. The short trip lasted an hour and ten minutes, all the while the officers took an oral statement from Larson.

son's consent. Following *Brown,* the Texas courts look to four relevant factors to determine whether the taint was attenuated: (1) whether *Miranda*[9] warnings were given; (2) the temporal proximity of the arrest and the consent or statement;[10] (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Johnson v. State,* 871 S.W.2d 744, 751 (Tex. Crim.App.1994). The majority has analyzed the evidence concerning these factors and has determined that: factor one (*Miranda* warnings were given) favors the State; factor two (temporal proximity) favors Larson; factor three (intervening circumstances) favors Larson; and factor four (purpose and flagrancy of official misconduct) favors the State.

I agree with the majority about factors one, two, and three. I believe that the fourth factor is a neutral consideration. Some of the reasons why I disagree with the majority's conclusion that the fourth factor, the purpose and flagrancy of official misconduct, "falls in favor of the State" are the following: the police requested Larson's consent to search—she did not volunteer her consent; Ranger Dunham initially proposed to obtain a search warrant because he knew Larson's house and business needed to be searched, but after consulting with the Titus County district attorney, he decided to proceed to arrest Larson and obtain her consent (indicating that the police planned from long before they obtained the arrest warrant to get Larson to consent to a search); the officers testified they knew that in order to obtain an arrest warrant they needed to allege facts within their knowledge, and they knew that the affidavits for information did not contain any facts; and the trip "to jail," during which Larson was interrogated for one hour and ten minutes, indicates that the purpose of the trip was not to transport Larson to jail but to obtain her statement.

The flagrancy of the official misconduct is not so great, but the purpose of the conduct was to obtain Larson's consent to search.

The decision not to obtain a search warrant because obtaining her consent would be a legally preferable option indicates conduct that seeks to evade the legal requirements for a search—conduct close to misconduct. Likewise, the long time taken for what should have been a short trip indicates that the officers' purpose was not to transport her to jail, as indicated, but rather to question her. This conduct could be said to be devious. I cannot agree that the purpose—to evade the legal requirements for a search of a person's home—and flagrancy of official misconduct is so on the side of the officials that this fourth factor favors the State.

However, my disagreement with the majority is on more fundamental bases than a different view of this fourth factor. The core flaw in the majority's opinion is the total failure to conduct any balancing test or analysis of the four factors. Perhaps its failure to weigh those factors is explained by the reality that any rational weighing of those factors reveals that the State has not met its burden to show by clear and convincing evidence that the taint resulting from the illegal arrest had dissipated when Larson consented to a search of her home.

Indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. *New York v. Harris,* 495 U.S. 14, 19, 110 S.Ct. 1640, 1643–44, 109 L.Ed.2d 13, 21 (1990); *Brown v. Illinois,* 422 U.S. 590, 598, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416, 424; *see also Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441, 453 (1963). The initial wrong consists of the police's having control of the accused at the time of the consent. *See* Daniel A. Klein, Annotation, *When is Evidence which is Obtained after Unconstitutional Search or Seizure Sufficiently Remote from such Search or Seizure so as not to be Tainted by, and not to be Inadmissible as Fruit of, such Search or Seizure—Supreme Court Cases,* 109 L.Ed.2d 787, 793 (1990). Beginning with

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. This factor is based on the reasoning that, ordinarily, the shorter the time, the more likely

the taint of the illegal arrest has not been purged. *Juarez v. State,* 758 S.W.2d 772, 781 (Tex.Crim. App.1988).

the clearly unlawful arrest of Larson, the question becomes whether the causal connection between the illegal arrest and the acquisition of evidence is so remote and attenuated as to purge the taint of the constitutional violation and make the evidence admissible. *See Harris*, 495 U.S. at 18–20, 110 S.Ct. at 1643–44, 109 L.Ed.2d at 21; *Nardone v. United States*, 308 U.S. 338, 340–41, 60 S.Ct. 266, 267–68, 84 L.Ed. 307, 311–12 (1939). This question is only slightly addressed by the majority, which seems to have been mesmerized by the evidence indicating that Larson at some time may have worked, in some capacity, with the police department of Pittsburg, Texas. This is discussed as a "fifth factor," and it is this fifth factor on which the majority rests its decision.[11]

The concurring opinion also has embraced the error of the majority. Not only does the concurring opinion elevate the scant evidence of Larson's "police experience," it also exaggerates her intelligence and pulls from thin air Larson's "contemptuous estimate of the capacity and skill of the minions of the law." *Larson v. State*, 890 S.W.2d 200, 209 (Chadick, J., concurring). Any review of this record reveals that Larson's actions in the criminal episode were not those of a shrewd criminal but were more akin to those of Stanley Laurel or Oliver Hardy of Laurel and Hardy, or to those of the Three Stooges. Nonetheless, her actions are portrayed by the concurring opinion to be more comparable to Sherlock Holmes' nemesis, Moriarity. The concurring opinion seems more to expose the deficiencies of, rather than to strengthen the majority opinion.

I cannot agree that the State has proved by clear and convincing evidence that the taint resulting from the illegal arrest had dissipated five minutes after the illegal arrest when the only things that transpired were: (1) Rule got dressed, (2) Larson got dressed, (3) the officers read Larson her *Miranda* rights, (4) the officers asked Larson for her consent to search; and (5) the officers got

Larson to sign the consent form. Furthermore, I disagree with the manner in which the majority treats the attenuation question.

I respectfully dissent.

---

11. I am not persuaded that this fifth factor—that the majority concludes "comes down strongly in favor" of the State—is appropriate for consideration in looking at an attenuation issue. *See, e.g., Arcila v. State*, 834 S.W.2d 357, 359 n. 1 (Tex. Crim.App.1992) (plurality opinion) (distinguishing the issue of the voluntariness of the consent from the issue of whether such consent was the product of unattenuated official illegality); *id.* at 361 (Clinton, J., concurring) (distinguishing claim of involuntary consent from claim that consent is tainted product of illegal arrest).